David J. Millstein (SBN 87878)
Kevin D. Cardona (SBN 314033)
MILLSTEIN FELLNER LLP
100 The Embarcadero, Penthouse
San Francisco, CA 94105
Telephone: (415) 348-0348
Facsimile:  (415) 348-0336
dmillstein@millsteinfellner.com
kcardona@millsteinfellner.com

**Attorneys for Plaintiff:**
HUNDRED ACRE WINE GROUP INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| HUNDRED ACRE WINE GROUP INC., a Delaware Corporation,<br><br>       Plaintiff,<br><br>v.<br><br>TWO 4 STU, LLC, a California limited liability company dba LERNER PROJECT; STUART JAY LERNER, an individual; VINE VAULT LLC, a Georgia limited liability company; and ELTON POTTS, an individual,<br><br>       Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1. **Misappropriation of Trade Secrets in Violation of Defense of Trade Secrets Act (18 U.S.C. § 1836)**<br><br>2. **Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964 (c))**<br><br>3. **Misappropriation of Trade Secrets in Violation of California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 et seq.)**<br><br>4. **Breach of Written Contract (Cal. Civ. Code § 3426.7)**<br><br>5. **Injunctive & Declaratory Relief**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Hundred Acre Wine Group ("Hundred Acre") brings this lawsuit based upon the following allegations:

## I.    THE PARTIES

1.     Plaintiff HUNDRED ACRE WINE GROUP, Inc. ("Hundred Acre") is DELAWARE CORPORATION, with its principal place of business in St. Helena, California.

2.     Defendant TWO 4 STU LLC is a California limited liability company with its principal place of business located at 30 Kortum Canyon Road, Calistoga, California. TWO 4 STU LLC is a winery which sells retail bottles of wine throughout the United States. TWO 4 STU LLC does business using the fictitious business name the "Lerner Project" and is hereinafter referred to as "Lerner Project".

3.     Defendant STUART JAY LERNER (hereinafter referred to as "Lerner"), is the founder and president of the Lerner Project, and, on information and belief, owns a majority of the shares of VINE VAULT, LLC. He resides at 3712 Rancho Estates Ct., Walnut Creek, California.

4.     Defendant VINE VAULT, LLC (hereinafter "Vine Vault") is a limited liability company organized under the laws of the State of Georgia, with its principal place of business in Atlanta, Georgia.

5.     Defendant ELTON POTTS (hereinafter "Potts") is the owner, manager, founder, and CEO of Vine Vault.

## II.    JURISDICTION

6.     This Court has federal question jurisdiction over Plaintiff's alleged claims pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1836 (Defense of Trade Secrets Act), 18 U.S.C. § 1964 (Racketeer Influenced and Corrupt Organizations Act), and supplemental jurisdiction over all other claims asserted herein pursuant to 28 U.S.C. § 1367.

## III.    VENUE & DIVISIONAL ASSIGNMENT

7.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1391(c) because, among other reasons, Lerner Project and Lerner are subject to personal jurisdiction in

this judicial district, Vine Vault conducts substantial business in this judicial district, and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, specifically in Napa County. Pursuant to Northern District Civil Local Rule 3-2(d), civil actions that arise in the County of Napa should be assigned to the San Francisco or Oakland Division.

## IV.   FACTUAL ALLEGATIONS

### a.  Hundred Acre's business model and trade secret

8.      Hundred Acre is a business that produces and sells fine wines to individual consumers throughout the United States in interstate commerce, and internationally, principally under the name "Hundred Acre". The wines sell for a premium price and have been awarded numerous awards and accolades from professional wine critics.

9.      Jayson Woodbridge ("Woodbridge") is the CEO, CFO, and Secretary for Hundred Acre, as well as its founder.

10.      Woodbridge has spent twenty years personally cultivating a customer base through extensive and costly marketing efforts, including travel, regular personal letters and other direct customized communications by Woodbridge which are not publicly available.

11.      Hundred Acre's customers are connoisseurs who search for the most valuable and acclaimed wines. Many customers see Hundred Acre wines as investments and will store the wine for years after purchase to increase its value.

12.      Hundred Acre's wines have received 33 perfect 100-point scores from critics such as wine editors of The Wine Advocate and Jeb Dunnuck. Hundred Acre has also received acclaim from numerous overseas newspapers and magazines and therefore cultivated a considerable foreign client list.

13.      Defendants have stolen and misappropriated the following information which Plaintiff considers its trade secret: Plaintiff's customer identifying information (customer name, email address, phone number), shipping data (delivery address), and purchasing history (quantity of bottles, type or name of wine, and value of the shipment, date and frequency of orders) which

was shared by Plaintiff with VINE VAULT LLC in the course of VINE VAULT LLC rendering shipping services to Plaintiff at any time, and derivative data or data related to those customers or shipments created by any Defendant **("Trade Secret")**.

14.     **Independent Economic Value.** Hundred Acre has no tasting rooms, and other than through its website is only available at a few select retailers. The volume of total wine sales through those select retailers constitutes only about 10% of Hundred Acre's total wine sales volume. Hundred Acre sells and ships bottles of Hundred Acre wine directly to its customers, who must register with Hundred at its website. In order to purchase Hundred Acre wine outside of select specialty stores, an individual must apply though its website at https://www.hundredacre.com/signup, supply certain information, and agree to its Terms of Service, which terms include privacy policies which promise that Hundred Acre will maintain the confidentiality of their personal information. Once accepted, the individual is placed on a waiting list to become a "Member." The only way to receive wine offerings is through the list.

15.     Hundred Acre's Trade Secret derives significant independent economic value, whether actual and/or potential, from not being generally known to the public or competitors, or to other persons who can obtain economic value from their use or disclosure.  Hundred Acre derives substantial business advantage and significant economic benefit from maintaining the ownership and confidentiality of the Trade Secret because the names and addresses of all individuals who purchase Hundred Acre wine, as well as their buying history, and preferences are confidential information that cannot be obtained or recreated from any public source, and is not shared with any of Hundred Acre's competitors.

16.     **Not Generally Known.** The names, customer preferences, and quantities of purchase by each customer is information maintained at Hundred Acre's offices and is highly confidential. Hundred Acre does not provide the information collected from its customers to anyone other than the shipment companies or carriers it uses. It does not sell any data it collects from customers in the course of selling them wine. Hundred Acre wine is rarely available for purchase at special retail locations and some restaurants and the majority of wine can only be

purchased directly from Hundred Acre. Because customer information is treated as confidential by Hundred Acre, an aggressive or diligent competitor would be unable to discover this confidential information without stealing it.

17.     Hundred Acre has expended significant amounts of time, effort, and money to ensure that the Trade Secret was not, and is not, disclosed or otherwise made publicly available, and to preserve and maintain the confidentiality of the Trade Secret.

18.     **Reasonable Efforts to Maintain Secrecy.** Hundred Acre took reasonable steps to protect the secrecy of the Trade Secret by, *inter alia*:

    a.  Not sharing the customer list or information with retailers;

    b.  Not offering public tours of Hundred Acre facilities;

    c.  Having all Hundred Acre employees execute non-disclosure agreements;

    d.  Storing information collected from customers during sign-up, browsing, and making purchases on Hundred Acre's website behind an ultra-secure firewall on its database that is encrypted and not accessible to the public;

    e.  At the time of Vine Vault and Stuart Lerner's misuse and misappropriation of the Trade Secret, the information was only contained on a secure server on Hundred Acre premises which had no internet connectivity, and was encrypted and very secure. Since then, the data was placed on a highly encrypted and secure cloud server;

    f.  Access to the Trade Secret is limited to a few Hundred Acre employees, who have signed non-disclosure agreements;

    g.  Having a published privacy policy specifying that Hundred Acre is "the sole owner of the information collected on" its website and in which Hundred Acre promises that it "will not sell, share, or rent this information to others" "unless [Hundred Acre is] given explicit authority to do so by you, our customer" or when disclosure is compelled by court order"; and

h. Requiring all contactors, consultants, and shipping companies, including Vine Vault and other wine storage and delivery vendors, to execute non-disclosure agreements ("NDAs") which explicitly require that the Trade Secret information be kept confidential and declare it a trade secret. The NDAs, including the one that Vine Vault and Hundred Acre executed prohibits any third party from using the customer and delivery information for any other purpose besides fulfilling the job for which the vendor was hired.

19. Except for small portion of Hundred Acre's sales (made to restaurants and a small number of exclusive stores), the exclusive manner by which the public can purchase Hundred Acre Wine is by membership in the Company's active mailing list. The list of members is highly confidential. Only 6 employees of the Company have access to the list. It is a password-protected e-commerce application.

20. Once an applicant to the list is admitted, they can receive updates and are able to purchase wine. After an order is placed it is shipped through a small number of shipping companies that Hundred Acre employs, one of which was Vine Vault.

21. Hundred Acre's website privacy policy reflects its intent and belief that the information that is necessarily collected by third parties to complete delivery through vendors such as Vine Vault, will be treated as confidential and only used for the purpose of fulfilling the orders: "Although we use outside shipping companies to ship orders and a credit card processing company to bill users for goods and services, these companies do not retain, share, store or use personally identifiable information for any secondary purposes".

b. **Vine Vault's business**

22. Vine Vault is a wine storage and transportation business. It provides for direct shipment services along certain established delivery routes and to a specific list of zip codes that define its shipment area.

23. Potts is the CEO of Vine Vault.

24. Lerner is and at all times herein relevant was a majority owner of Vine Vault.

25.     On information and belief, Potts is personal friends with Lerner.

26.     On information and belief, Potts and Vine Vault support Lerner Project's business by organizing wine tasting and other marketing events for Lerner Project to advertise and sell its wines to the public at a net cost to Lerner Project, or entirely for free for Lerner Project, in exchange for Lerner Project agreeing to use Vine Vault to deliver its wines.

27.     According to its website, Vine Vault has temperature-controlled wine storage facilities in Atlanta, GA; Austin, TX; El Monte, CA; Doral, FL; Napa, CA; and Philadelphia, PA. Its "winery logistic services" are based in Napa, CA.

**c.  <u>Lerner Project</u>**

28.     The Lerner Project is Lerner's winery. Lerner is the CEO of Lerner Project, a managing member, and the founder of Lerner Project. Lerner founded the winery in 2014 and Lerner Project was incorporated in or around October 2015.0

29.     Lerner Project's principal place of business is in Calistoga, California. Lerner Project makes wines from grapes grown in nearby vineyards of Napa and Sonoma County.

30.     Lerner Project's wines are offered for direct sale to the general public for prices around $275 per bottle. Lerner Project does not require any membership or invitation to purchase its wines and does not have a waiting list.

31.     Lerner Project used and continues to use Vine Vault as its preferred shipping company to ship wine to Lerner Project's customers.

**d.  <u>Vine Vault's Access to Hundred Acre's Trade Secret</u>**

32.     Hundred Acre hired Vine Vault as a vendor for shipments to consumers residing in warmer (e.g. California) and/or excessively humid climates (e.g. Florida) where transportation and storage in a climate-controlled environment is necessary to minimize the risk of negative impacts on the quality of the wine.

33.     Hundred Acre hired Vine Vault in October 2018 to deliver wine bottles to customers in refrigerated trucks kept at the proper temperature for the storage of Cabernet.

34.     On October 11, 2018, Hundred Acre and Vine Vault entered into a non-disclosure agreement (NDA) that protects the Trade Secret in the course of Plaintiff using Vine Vault's shipping services. ("VV NDA"). The VV NDA states in relevant part:

> From time to time, Disclosing Party [Hundred Acre] may share certain proprietary and/or confidential information with the Recipient, including the identity and other personal information about its customers. The purpose of this Agreement is to set forth the terms and conditions under which such information will be maintained in confidence by the Recipient [Vine Vault].
> […]
> 1. Definition of Confidential Information. (a) For purposes of this Agreement, "Confidential Information" means any data or information relating to the Transaction that is proprietary to Disclosing Party, whether in tangible or intangible form, whenever and however disclosed, including, but not limited to any customer, financial, operational, technical, legal or other business information, including projections, estimates, business plans, trade secrets, notes, analyses, compilations, studies and performance results relating to past, present or future business activities, and any plans for future products or services, inventions, designs, processes, and procedures. Recipient acknowledges that the Confidential Information is proprietary to Disclosing Party, has been developed and obtained through great efforts by Disclosing Party and that Disclosing Party regards all of its Confidential Information as trade secrets.
>
> 2. Disclosure of Confidential Information. Recipient will: (a) limit disclosure of any Confidential Information to its directors, officers, employees, agents or representatives (collectively "'Representatives") who have a need to know such Confidential Information in connection with the current or contemplated business relationship between the parties to which this Agreement relates; (b) advise its Representatives of the proprietary nature of the Confidential Information and of the obligations set forth in this Agreement and require such Representatives to keep the Confidential Information confidential; (c) keep all Confidential Information strictly confidential by using a degree of care not less than that used by it in safeguarding its own confidential information; and ( d) not disclose any Confidential Information received by it to any third parties (except as otherwise provided herein). Each party will be responsible for any breach of this Agreement by their respective Representatives.

> 3. <u>Use of Confidential Information.</u> Recipient agrees to use the Confidential Information solely in connection with the current or contemplated business relationship between the parties and not for any purpose other than as authorized by this Agreement without the prior written consent of Disclosing Party. No other right or license, whether expressed or implied, in the Confidential Information is granted to Recipient hereunder. Title to the Confidential Information, including any modifications and improvements, will remain solely in Disclosing Party.

(See **Exhibit A** attached hereto.)

35.     The term of the VV NDA was for two (2) years, however it affords indefinite protection for confidential information obtained by Vine Vault or its agents prior to the expiration of the term: "Notwithstanding the foregoing, the parties' duty to hold in confidence Confidential Information that was disclosed during this term will remain in effect indefinitely." (Exhibit A ¶ 5.)

36.     Further, Defendants Vine Vault and Potts and their agents were at all times herein aware and had reason to know that the Trade Secret was information that Plaintiff treated as confidential and as a protected trade secret because, *inter alia*:

   a.   Hundred Acre and Vine Vault entered into the VV NDA at the beginning of their business relationship that defined the Hundred Acre lists as confidential and trade secrets;

   b.   Defendants Vine Vault and Potts learned in the course of the business relationship that Hundred Acre employed substantial safeguards to maintain its customer information confidential internally, was not accessible to the general public, consisted of an exclusive list of customers that needed to sign up on a waiting list to purchase Hundred Acre wine, that Hundred Acre's were high spenders, and that the Trade Secret therefore derived independent economic value from its secrecy;

c.  Hundred Acre shared its Trade Secret information only with those principals, agents, or employees of Vine Vault who needed to know the information to fulfill shipping orders; and

d.  Hundred Acre continually reminded Vine Vault principals, agents, or employees to maintain confidentiality of the Trade Secret.

37.   Pursuant to paragraph 7 of the VV NDA, Hundred Acre may at any time request the return or destruction of any Trade Secret information Vine Vault obtained from Hundred Acre, and in response Vine Vault is required to return or destroy any files containing the Trade Secret, copies of those files, or notes, memos, or derivative information. (Exhibit A ¶ 7.)

38.   Shortly after execution of the NDA, Hundred Acre provided Vine Vault with Trade Secret information only to the extent needed to fulfill orders through Vine Vault, i.e. to ship the wine.

39.   Whenever Hundred Acre received purchase orders from addresses or zip codes that were part of Vine Vault's shipping regions, Hundred Acre sent spread sheets via email to Vine Vault representative that contained the Trade Secret information.

40.   Vine Vault obtained contact information and purchase data relating to 5,000-8,000 individual Hundred Acre customers over the course of rendering its services for Hundred Acre, which represented about 20-25% of Hundred Acre's direct consumers.

41.   From the Trade Secret information Vine Vault could determine which customers purchased the most wine and how much customers were spending on a Hundred Acre wine on an annual basis. This list could be considered a collection of the wealthiest purchasers of Napa Valley wine. Most of Hundred Acre's customers buy every new release of wine, running about $600-700 per bottle.

**e.  <u>Trade Secret Misappropriation</u>**

42.   Plaintiff alleges on information and belief that Lerner has a proprietary interest in Vine Vault, and specifically that Lerner is a majority member of Vine Vault and therefore has

access to data collected from Vine Vault's customers, including but not limited to, the Trade Secret.

43.     On information and belief, if Lerner did not personally have direct access to Vine Vault's data, then Lerner asked Potts to provide him a list of Hundred Acre's customers who received shipments through Vine Vault, or a list of the highest spending customers who ordered through Vine Vault of which a large number were Hundred Acre customers, in order to solicit them as customers and target Lerner Project wine sales towards them.

44.     In or around September 2019, Lerner told Matt Simpson ("Simpson"), an employee and 10% owner of the Lerner Project at the time, that he obtained a list of Hundred Acre's customers from Vine Vault. Lerner handed Simpson a folder full of the Trade Secret information and told Simpson that those Hundred Acre customers would need to be added to Lerner Project's mailing list for the purpose of soliciting customers for Lerner Project. Lerner asked Simpson to enter the Hundred Acre Customer Data into Lerner Project's Customer Relations Management System ("CRM") from which Lerner Project sent its marketing e-mails.

45.     Simpson told Lerner that he refused to add the Trade Secret information to Lerner Project's CRM because he thought it was illegal to do so.

46.     On or around February 3, 2020 Lerner began to personally copy Trade Secret information into the CRM. From on or about February 3, 2020 to February 11, 2020, Lerner or his agents at his direction added more than 900 customer names to Lerner Project's CRM, more than doubling all the names previously on Lerner Projects CRM. A large portion of those added names were Hundred Acre customers.

47.     Over the next two (2) months, Simpson repeatedly told Lerner not to use the Hundred Acre Customer Data that Lerner misappropriated. Lerner terminated Simpson over the complaints.

48.     Plaintiff alleges on information and belief that after February 2020, Lerner continued to add Trade Secret information to Lerner Project's CRM as it became available or was provided by Vine Vault. Plaintiff further alleges on information and belief that Defendants

Lerner and Lerner Project also have misappropriated and continue to misappropriate customer data from other customers of Vine Vault to target those customers with direct marketing efforts by Lerner Project.

49.     Upon Simpson's termination from Lerner Project, Lerner required Simpson to sign a confidentiality agreement as a condition of Simpson obtaining a buy-out of his shares of Lerner Project. The confidentiality agreement had a period of two years, so that Simpson could not inform Plaintiff of the Trade Secret misappropriation sooner.

50.     Plaintiff alleges on information and belief that Defendants Potts and Vine Vault gave Lerner Trade Secret information because they intended to benefit financially from the larger number of orders that would result if Lerner Project increased its sales by targeting Hundred Acre customers. Vine Vault is Lerner Project's preferred shipping vendor. Because Lerner is a part owner of Vine Vault, Defendants Potts, Vine Vault, Lerner, and Lerner Project profited in more than one way from this illegal scheme to steal and misappropriate Hundred Acre's Trade Secret.

51.     On information and belief, those customers would not likely have purchased Lerner Project wine but for Defendants' misappropriation of the Trade Secret because:

     a.   Lerner Project is a much younger winery with less resources and funding to put into marketing efforts to develop its own customer base;

     b.   Lerner Project is much less widely known than Hundred Acre;

     c.   Lerner Project wines have received less critical acclaim, and therefore less publicity than Lerner Project wines;

     d.   Lerner Project wines have a substantially lower price point that may indicate lesser quality to customers, or that they do not appreciate with value;

52.     The use of the Hundred Acre customer list resulted in immense savings in time (20 years) and money (millions of dollars) that Lerner Project would otherwise have to put into advertising, soliciting, marketing, research and development to create a comparable customer

list, which even then would be extremely unlikely to match the caliber of customers on the Hundred Acre customer list.

53.    Plaintiff alleges on information and belief that Defendants Lerner and Lerner Project continue to acquire additional customers and profit from the unauthorized theft and use of the Trade Secret.

54.    In or around June 2022, Simpson contacted Woodbridge to tell him about Lerner's theft of Trade Secret information, and that Lerner then began utilizing it for advertising the sale of Lerner Project wine to Hundred Acre customers through the CRM and Vine Vault's road shows.

**f.    Vine Vault's Road Shows**

55.    Lerner Project invited these newly targeted Hundred Acre customers to Lerner Project tasting events and other events where Lerner Project could directly solicit business from those Hundred Acre customers.

56.    Between October 2018 and June 2022, Defendants Vine Vault and Lerner Project also misappropriated the Trade Secret to invite Hundred Acre customers to national wine tasting road shows organized by Vine Vault that took place multiple times per year in locations all across the country. These road shows are variably referred to by different titles such as "Vine Vault Road Show" or "Visit From the Valley", but they always or nearly always feature Lerner Project as one of the participant wineries.

57.    Vine Vault ensured that Lerner Project would be a featured winery at the road shows so that Lerner Project could solicit Hundred Acre's customers to purchase Lerner Project wine. The Hundred Acre customers received unsolicited e-mails from Vine Vault inviting them to these road shows, and the Hundred Acre customers did not consent to being contacted for such marketing events by Vine Vault, and neither did Hundred Acre consent to Vine Vault contacting its customers about the road shows.

58.    In or around June 2022, Woodbridge received complaints from Hundred Acre's customers that they were (1) added to Lerner Project mailing lists without their consent and

never having purchased Lerner Project wines or been to any marketing events of Lerner Project, and (2) received unsolicited communications from Vine Vault inviting them to the road shows organized or hosted by Vine Vault.

59.     Woodbridge immediately complained to Potts via e-mail that Vine Vault was misusing the Trade Secret without authorization and contacting or signing them up Hundred Acre customers for marketing emails related to the wine road shows. In reply Potts apologized and admitted to the use of the Trade Secret to market "charity events" to them, i.e. the road shows.

60.     Shortly thereafter Vine Vault published a revised privacy policy guaranteeing that Vine Vault would not use its customer's data for any purpose other than to fulfill shipping orders unless otherwise authorized by its customers.

**g.  Statistical Evidence**

61.     Between September 1, 2019 and March 31, 2022 approximately 31% of Hundred Acre's wine orders shipped through Vine Vault, which represented about 48% of Hundred Acre's individual customers during the same time.

62.     Of the e-mail addresses of customers to which Hundred Acre shipped using Vine Vault between October 14, 2019 and June 9, 2020, nearly half of those e-mail addresses were also added to Lerner Project's CRM during the same period.

63.     Between February 3-9, 2020, Lerner Project added 922 customers and their contact information to its CRM, often in bouts of adding them as frequently as one new customer per minute.

**h.  Damages from Trade Secret Misappropriation**

64.     The unauthorized disclosure of any part of the Trade Secret substantially diminishes the value of Hundred Acre's business because those customers have been selectively targeted and solicited by competitors.

65.     Due to the exclusivity and confidential nature of Hundred Acre's list of high-end wine purchasers that it has amassed over two decades, the misappropriation and theft of this information confers a significant unearned business advantage to Defendants.

66.     As a result of the theft, misappropriation, and unauthorized use of Hundred Acre's confidential trade secrets, Hundred Acre suffered damages and continues to suffer damages in the form of:

      e.   Diminution in the enterprise value of Plaintiff's business;

      f.    Plaintiff's lost profits;

      g.   Defendants' unjust enrichment obtained from sales and shipments they made to Hundred Acre customers;

      h.   Increased marketing costs to Hundred Acre to recoup lost market share stolen by Defendants;

      i.    Lost future profits;

      j.    Costs incurred to develop the Trade Secret; and

      k.   Defendants' time and costs saved from not having to develop the Trade Secret through its own diligence.

**i.   RICO Enterprise affecting Interstate Commerce: Vine Vault and Visit from the Valley**

67.     On information and belief, Defendants Potts and Lerner are long-time personal friends and have engaged in multiple business ventures throughout the preceding decades.

68.     Defendants Potts and Lerner both share a background in the logistics and palleting industry. Lerner has operated as a "major wood pallet vendor to Napa Valley and Sonoma County for over four decades" as stated on the Lerner Project website: www.lernerproject.com/people

69.     Lerner has also operated or owned several wood pallet manufacturing businesses over the past few decades that sold pallets across various regions of the country. Most recently he owned Bluechip Logistics which built or repaired pallets for CHEP USA.

70.    Potts formerly was the senior vice president of supply chain & asset management for CHEP USA and the COO of Recall Inc.

71.    In 2013 Potts retired from his former job, and in 2014 Lerner retired from Bluechip.

72.    Vine Vault and Lerner Project were organized within a year from each other and have existed since about 2014 or 2015 as set forth above.

73.    In September 2021, Potts and Lerner, along with other business partners announced the launch of their new smart pallet company: Pooling and Logistics Experts, which operates under its registered trademarked name "PALX". Potts and Lerner are board members of PALX and are thus business partners in more than one aspect.

74.    In or around 2019, Potts and Lerner conspired to operate Vine Vault as a unlawful RICO enterprise to increase sales to both Vine Vault and the Lerner Project by stealing confidential customer data and trade secrets from Vine Vault's winery clients and marketing Lerner Project's wines directly to those unlawfully obtained customers.

75.    Vine Vault and Lerner Project were engaged in, or its activities affect, interstate or foreign commerce because Vine Vault and Lerner Project sell and ship to customers across the country and in some cases internationally, and because Visit from the Valley which is operated by Potts conducts road shows in numerous locations across the country and in different states, wherein the wineries make direct sales to consumers, including for shipments across state lines.

76.    Defendant Potts is the CEO of Vine Vault and Lerner is the CEO of Lerner Project. On information and belief, Lerner is also a majority member of Vine Vault. As such, both Lerner and Potts are employed by or associated with the enterprise Vine Vault. Further, on information and belief Lerner also participates in each of Vine Vault's wine road shows and is therefore also associated with that enterprise of making in person sales to customers targeted from unlawfully obtained trade secrets.

<u>**FIRST CLAIM FOR RELIEF:**</u>

**Misappropriation of Trade Secrets in Violation of Defense of Trade Secrets Act (18 U.S.C.**

**§ 1836)**

**(Against all Defendants)**

77.     Hundred Acre repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

78.     Hundred Acre's Trade Secret constitutes a protectable trade secret under 18 U.S.C. § 1839(3) because it (1) represents a compilation of financial, business, or economic information that is memorialized physically and electronically, (2) Hundred Acre has taken reasonable measures to keep such information secret as set forth above, and (3) the information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

79.     Hundred Acre's Trade Secret has been and continues to be the subject of Hundred Acre's reasonable measures to keep such information secret as outlined above.

80.     Defendants misappropriated Hundred Acre's Trade Secret as defined in 18 U.S.C. § 1839(5) by:

a.  Defendants Lerner and Lerner Project acquiring the Trade Secret of Hundred Acre by improper means without authorization from Hundred Acre;

b.  Defendants knew or had reason to know that the Trade Secret information was originally acquired by Vine Vault and Potts under circumstances giving rise to a duty to maintain the secrecy of the Trade Secret or limit the use of the Trade Secret, or was derived from or through a person who owed a duty to Plaintiff to maintain the secrecy of the Trade Secret or limit the use of the Trade Secret;

c.  And by such other methods as set forth above.

81.     The trade secrets that Defendants misappropriated from Plaintiff are related to a product or service used in, or intended for use in, interstate or foreign commerce.

82.     Pursuant to 18 U.S.C. § 1836, Plaintiff is entitled to damages for its actual loss caused by the Defendants' misappropriation of Plaintiff's trade secret and damages for unjust enrichment by Defendants through the misappropriation.

83.     As a result of Defendant's misappropriation, Hundred Acre has been and continues to be damaged and irreparably injured, including without limitation, the loss of sales and profits it would have earned but for Defendant's actions, damage to the valuation of Plaintiff's business and damage to Hundred Acre's reputation among potential and existing customers, business partners, investors, and in the industry in general.

84.     Defendants' misappropriation of Plaintiff's Trade Secret is and was willful and malicious and thereby entitles Hundred Acre to an award of exemplary damages up to twice the amount of Plaintiff's damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

85.     Defendant's misappropriation of Hundred Acre's Trade Secret has caused and will continue to cause Hundred Acre irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Defendant from further use or disclosure of Hundred Acre's confidential and trade secret information is necessary to provide Hundred Acre with complete relief.

## SECOND CLAIM FOR RELIEF:

**Violation of Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964 (c))**

**(Against Defendants Potts, Lerner and Lerner Project)**

86.     Hundred Acre repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

87.     Defendants Potts, Lerner, and Lerner Project are associated with or employed by Defendant Vine Vault, which serves as their unlawful enterprise to target high-end wine customers for direct solicitation for sales of wine by Lerner Project and Vine Vault to increase the sales of Lerner Project and Vine Vault. The customers are not generally known to the public and Defendant's Trade Secret derives significant value from its customer base not being known or readily ascertainable by the public and competitors.

88.     Defendants Potts, Lerner, and Lerner Project engaged in a pattern of racketeering activity by stealing the Trade Secret in violation of 18 U.S.C. § 1832 on multiple occasions and to present day, as alleged above. On information and belief, the pattern of racketeering is also accomplished by stealing the trade secrets and confidential customer data of other winery clients of Vine Vault.

89.     Predicate acts: Trade Secret Theft in violation of 18 U.S.C. § 1832. 18 U.S.C. § 1832 makes it a crime punishable with up to 10 years in prison for anyone to steal trade secrets used in interstate commerce. The federal statute states:

> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly--
>
> (1) **steals, or without authorization appropriates**, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
>
> (2) **without authorization copies, duplicates**, sketches, draws, photographs, downloads, uploads, alters, destroys, **photocopies, replicates**, transmits, **delivers, sends, mails, communicates, or conveys such information**;
>
> (3) **receives, buys, or possesses such information**, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
>
> (4) attempts to commit any offense described in paragraphs (1) through (3); or
>
> (5) **conspires with one or more other persons to commit any offense described in paragraphs (1) through (3),** and one or more of such persons do any act to effect the object of the conspiracy, shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both.

90.     Companies that commit any of the offenses in 18 U.S.C. § 1832(a) may be punished with a fine no more than the greater of $5 million or three times the value of the stolen trade secret to the organization. 18 U.S.C. § 1832(b).

91.     Trade secret theft punishable pursuant to 18 U.S.C. § 1832 is enumerated as one of the federal crimes that falls into the definition of "racketeering activity" that may form the basis of a RICO claim. 18 U.S.C. § 1961.

92.     Defendants Vine Vault and Potts engaged in acts violative of 18 U.S.C. § 1832 by, *inter alia*:

- Without authorization copying, replicating, sending, conveying, delivering the confidential Trade Secret to Defendants Lerner and Lerner Project;
- Conspiring with Defendants Lerner and Lerner Project to steal the Trade Secret and send it to Lerner;

93.     Defendants Vine Vault, Potts, Lerner and Lerner Project conspired to steal Plaintiff's trade secrets with the intent to receive an economic benefit because the increased sales of Lerner Project resulting from the misuse of the Trade Secret also benefits Vine Vault financially by increasing the number of shipments fulfilled by Vine Vault for the Lerner Project.

94.     Defendants Lerner and Lerner Project engaged in acts violative of 18 U.S.C. § 1832 by, *inter alia*:

- Without authorization copying, replicating, and adding the Trade Secret to their CRM software so those customers could be directly solicited for sales by Defendants Lerner and Lerner Project;
- Conspiring with Defendants Vine Vault and Potts to steal the Trade Secret;
- Receiving, buying, or possessing the Trade Secret, knowing the same to have been stolen or appropriated, obtained, or converted without authorization from Plaintiff, in violation of the VV NDA;

95.     As a result of the trade secret theft in violation of 18 U.S.C. § 1832, Plaintiff has suffered actual harm, including but not limited to a diminution in the valuation of Plaintiff's business.

96.     Pattern of Racketeering Activity. Defendants committed the crime of trade secret theft in violation of 18 U.S.C. § 1832 on numerous occasions by: converting or intending to

convert and copy Plaintiff's Trade Secrets on or around September 2019, in February 2020, as set forth above, and on information and belief, numerous times thereafter and on a continuing basis to this day. On information and belief, during this time and to present day Defendants also stole trade secrets of other Vine Vault clients.

97.     Defendants continue to use the Trade Secret and replicate the same without authorization as recent as June 2022, and likely many time before by Vine Vault targeting Hundred Acre customers with direct advertising for Vine Vault's road show wine tastings where all Defendants would financially profit from increased sales.

98.     Each of the acts of trade secret theft and replication, copying, or disclosure in violation of 18 U.S.C. § 1832 furthered the same end of targeting high-spending customers of wineries dispersed throughout the United States, in order to send direct marketing emails to them, and solicit their customers' business so that Defendants Lerner, Lerner Project and Potts could unjustly enrich themselves from the profits of increased sales to customers that are not generally known to the public.

99.     Defendants Potts, Lerner and Lerner Project's offending activities affected the exchange of interstate or foreign commerce by stealing customers from wineries that purchase wine sold from across stateliness.

100.    Defendants Potts, Lerner, and Lerner Project's theft, copying, sending, replication of Hundred Acre's trade secrets and other violations of 18 U.S.C. § 1832 as alleged above has caused and will continue to cause Hundred Acre substantial injury, including but not limited to lost profits, unjust enrichment by Defendants, and a diminution in value of Plaintiff's business.

101.    Pursuant to 18 U.S.C. § 1964, "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the costs of the suit, including a reasonable attorney's fee." Plaintiff accordingly seeks treble damages, costs of suit, and reasonable attorney's fees.

### THIRD CLAIM FOR RELIEF:

**Misappropriation of Trade Secrets in Violation of California Uniform Trade Secrets Act**

**(Cal. Civ. Code § 3426.1)**

**(Against all Defendants)**

102.    Hundred Acre repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

103.    Hundred Acre's Trade Secret constitutes a protectable trade secret under Cal. Civ. Code § 3426 et seq. because it consists of information, including a compilation of data that derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.

104.    Hundred Acre's Trade Secret has been and continues to be the subject of Hundred Acre's reasonable measures to keep such information secret as outlined above.

105.    Defendants misappropriated Hundred Acre's Trade Secret as defined in Cal. Civ. Code § 3426.1 by acquiring the trade secret knowing or having reason to know that the trade secret was acquired by improper means; and by disclosing or using the trade secret without express or implied consent after having acquired knowledge of the trade secret by improper means.

106.    At the time of Defendants' unlawful disclosure or use of Hundred Acre's Trade Secrets, they knew or had reason to know that the Trade Secret was derived from or through a person who had utilized improper means to acquire it, the Trade Secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, and/or the Trade Secret was derived from or through a person who owed a duty to Plaintiff to maintain its secrecy or limit its use.

107.    As a result of Defendants' misappropriation, Hundred Acre has been and continues to be damaged and irreparably injured, including without limitation, the loss of sales and profits it would have earned but for Defendants' actions, damage to the valuation of Plaintiff's business and damage to Hundred Acre's reputation among potential and existing

customers, business partners, investors, and in the industry in general. These damages are recoverable pursuant to Cal. Civ. Code § 3426.3.

108.     Defendants' misappropriation is willful and malicious and thereby entitles Hundred Acre to an award of exemplary damages up to twice the amount of Plaintiff's damages pursuant to Cal. Civ. Code § 3426.3.

109.     Defendants' misappropriation of Hundred Acre's confidential and trade secret information has caused and will continue to cause Hundred Acre irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Defendant from further use or disclosure of Hundred Acre's confidential and Trade Secret information is necessary to provide Hundred Acre with complete relief. Pursuant to Cal. Civ. Code § 3426.2 Plaintiff seeks such an injunction to enjoin actual or threatened future misappropriation.

## FOURTH CLAIM FOR RELIEF:

### Breach of Written Contract (Cal. Civ. Code § 3426.7)

### (Against Defendant Vine Vault LLC)

110.     Hundred Acre repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

111.     Pursuant to Cal. Civ. Code § 3426.7(b) the California Uniform Trade Secrets Act "does not affect (1) contractual remedies, whether or not based upon misappropriation of a trade secret, (2) other civil remedies that are not based upon misappropriation of a trade secret, or (3) criminal remedies, whether or not based upon misappropriation of a trade secret." See also Angelica Textile Services, Inc. v. Park, 220 Cal. App. 4th 495 (2013).

112.     Effective October 11, 2018, as set forth above, Plaintiff and Defendant Vine Vault entered into the VV NDA which provided that Vine Vault was to maintain any proprietary information or data collected of Hundred Acre relating to Vine Vault's delivery of Hundred Acre wine to its customers, and derivative information, in confidence. This "Confidential Information"

expressly included information related to "customer, financial, operational, technical, legal or other business information."

113.   The VV NDA also requires that Vine Vault maintain absolute confidence about the confidential information acquired during this term for eternity: "5. Term. This Agreement will remain in effect for a term of two years. Notwithstanding the foregoing, the parties' duty to hold in confidence Confidential Information that was disclosed during this term will remain in effect indefinitely." (Exhibit A, ¶ 5.)

114.   Defendant Vine Vault breached the contract by, *inter alia*, failing to hold Hundred Acre's Trade Ssecret and other information defined as entitled to confidential treatment in confidence during the term of the contract, and by misappropriating Hundred Acre's confidential information and Trade Secrets that Vine Vault obtained during the term of the contract, which are entitled to indefinite protection from unauthorized disclosure or use.

115.   Pursuant to paragraph 6 of the VV NDA, Plaintiff is entitled to injunctive relief preventing the dissemination of any confidential information, the return destruction of any record of Plaintiff's trade secrets that are in the possession of Defendants, and reasonable attorney's fees and costs for enforcing the terms of the VV NDA.

116.   Plaintiff also seeks an award for damages proximately caused by Vine Vault through its breach of contract pursuant to Civ. Code § 3300.

## FIFTH CLAIM FOR RELIEF:
### Declaratory and Injunctive Relief

### (Against all Defendants)

117.   Hundred Acre repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

118.   The VV NDA provides Plaintiff with a right to injunctive relief to stop Vine Vault's dissemination of Plaintiff's trade secrets. The VV NDA states in paragraph 6 that:

> Both parties acknowledge that the Confidential Information to be disclosed hereunder is of a unique and valuable character, and that

the unauthorized dissemination of the Confidential Information would destroy or diminish the value of such Confidential Information. Damages to Disclosing Party that would result from the unauthorized dissemination of the Confidential Information would be impossible to calculate. Therefore, both parties hereby agree that Disclosing Party will be entitled to injunctive relief preventing the dissemination of any Confidential Information in violation of the terms hereof. Such injunctive relief will be in addition to any other remedies available hereunder, whether at law or in equity. Disclosing Party will be entitled to recover its costs and fees, including reasonable attorneys' fees, incurred in obtaining any such relief. Further, in the event of litigation relating to this Agreement, the prevailing party will be entitled to recover its reasonable attorney's fees and expenses.

(Exhibit A, ¶ 6.)

119.   Further, under paragraph 7 of the VV NDA, Plaintiff may force Vine Vault to immediately return all copies or manifestations of Hundred Acre's confidential information shared with Vine Vault during the term of the VV NDA, or in the alternative, Plaintiff may force Vine Vault to immediately destroy all of its records of the confidential Hundred Acre information and require an authorized representative or officer of Vine Vault to certify that the destruction was completed.

120.   Plaintiff is also entitled to an injunction to remedy trade secret misappropriation pursuant to 18 U.S.C. 1836 and Cal. Civ. Code § 3426.

121.   Plaintiff seeks an injunction that:

   a.   Defendants are permanently enjoined from disclosing, selling, copying, concealing or utilizing the Trade Secret.

   b.   Defendants are prohibited from advertising, soliciting, selling to or communicating with those customers that they acquired through their use of the Trade Secret.

   c.   Defendants are prohibited from selling wine to those customers that were not already customers of Lerner or the Lerner Project prior to Defendants' theft or misappropriation of the Trade Secret, and must take those customers off of all of their marketing distribution e-mail lists and mailing lists to ensure that they do not

continue to receive marketing or advertisements for Defendants' services or products, or events organized by Defendants, such as the Visit from the Valley wine road shows.

d. Defendants must first produce to Plaintiff all records containing any of the Trade Secret information, related and derivative information thereof, and then destroy any hard or electronic copies of such documents in Defendants' possession, custody, or control, and ask their agents to do the same. A representative or officer of Vine Vault and Lerner Project must certify in writing that any record of the misappropriated Trade Secret, related and derivative information thereof, has been destroyed.

## **PRAYER FOR RELIEF**

WHEREFORE, Hundred Acre prays for the following relief:

A. A declaration that Defendant has wrongfully and maliciously improperly acquired or used Hundred Acre's trade secrets trade secrets without consent;

B. A declaration that Defendants Vine Vault and Potts breached the VV NDA.

C. A Judgment in Hundred Acre's favor that for damages for actual loss caused by the misappropriation of Hundred Acre's confidential information and Trade Secret;

D. A Judgment in Hundred Acre's favor that for damages for any unjust enrichment caused by the misappropriation of Hundred Acre's confidential information and Trade Secret that is not already addressed in computing damages for actual loss; or

E. In lieu of damages measured by any other methods, a judgment in Hundred Acre's favor that the damages caused by the misappropriation of Plaintiff's Trade Secret be remedied by imposition of liability for a reasonable royalty for Defendant's unauthorized disclosure or use of the Trade Secret;

F. An award of exemplary damages in an amount not more than two (2) times the amount of the damages awarded under paragraphs C and D above;

G.     A permanent injunction that Defendants are permanently enjoined from disclosing, selling, copying, concealing or utilizing the Trade Secret.

H.     A permanent injunction that Defendants are prohibited from advertising, soliciting, selling to or communicating with those customers that they acquired through their use of the Trade Secret.

I.     A permanent injunction that Defendants are prohibited from selling wine to those customers that were not already customers of Lerner or the Lerner Project prior to Defendants' theft or misappropriation of the Trade Secret, and must take those customers off of all of their marketing distribution e-mail lists and mailing lists to ensure that they do not continue to receive marketing or advertisements for Defendants' services or products, or events organized by Defendants, such as the Visit from the Valley wine road shows.

J.     A permanent injunction that Defendants must first produce to Plaintiff all records containing any of the Trade Secret information, related and derivative information thereof, and then destroy any hard or electronic copies of such documents in Defendants' possession, custody, or control, and ask their agents to do the same. A representative or officer of Vine Vault and Lerner Project must certify in writing that any record of the misappropriated Trade Secret, related and derivative information thereof, has been destroyed.

K.     An order permanently enjoining Defendants Vine Vault and Potts from further breaching the NDA;

L.     An order requiring Defendant to promptly deliver and turn over to Hundred Acre any and all property or information of Hundred Acre that is in Defendants' possession, custody or control;

M.     An order awarding Hundred Acre's Attorneys' fees;

N.     Treble damages pursuant to 18 U.S.C. § 1964.

O.     An order awarding interest and costs; and

Such further and other relief as the Court may deem proper and just.

By:_____
David J. Millstein, Esq.
Kevin D. Cardona, Esq.

Attorneys for PLAINTIFF
HUNDRED ACRE WINE GROUP, INC.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, HUNDRED ACRE WINE GROUP, INC. respectfully requests a trial by jury of any and all issues on which a trial by jury is available under applicable law.


Date:  November 17, 2022                          **MILLSTEIN FELLNER LLP**




By:_____
    David J. Millstein, Esq.
    Kevin D. Cardona, Esq.

    Attorneys for PLAINTIFF
    HUNDRED ACRE WINE GROUP, INC.

# EXHIBIT A

NON-DISCLOSURE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of this 11th day of October, 2018 by and between **Hundred Acre Wine Group** ("Disclosing Party") and **Vine Vault LLC** ("Recipient").

WHEREAS, Disclosing Party is a business of producing fine wine and selling it to certain individual consumers in the United States.  Recipient is interested in delivering this wine to the Disclosing Party's customers (Transaction). From time to time, Disclosing Party may share certain proprietary and/or confidential information with the Recipient, including the identity and other personal information about its customers. The purpose of this Agreement is to set forth the terms and conditions under which such information will be maintained in confidence by the Recipient. In consideration of the mutual promises and covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Definition of Confidential Information.  (a)  For purposes of this Agreement, "Confidential Information" means any data or information relating to the Transaction that is proprietary to Disclosing Party, whether in tangible or intangible form, whenever and however disclosed, including, but not limited to any customer, financial, operational, technical, legal or other business information, including projections, estimates, business plans, trade secrets, notes, analyses, compilations, studies and performance results relating to past, present or future business activities, and any plans for future products or services, inventions, designs, processes, and procedures. Recipient acknowledges that the Confidential Information is proprietary to Disclosing Party, has been developed and obtained through great efforts by Disclosing Party and that Disclosing Party regards all of its Confidential Information as trade secrets.

        (b)    Notwithstanding anything in the foregoing to the contrary, Confidential Information will not include information which: (i) was known by Recipient prior to receiving the Confidential Information from Disclosing Party; (b) becomes rightfully known to Recipient from a third-party source not known (after diligent inquiry) by Recipient to be under an obligation to Disclosing Party to maintain confidentiality; (c) is or becomes publicly available through no fault of or failure to act by Recipient in breach of this Agreement; (d) is required to be disclosed in a judicial or administrative proceeding, or is otherwise requested or required to be disclosed by law or regulation, although the requirements of paragraph 4 hereof will apply prior to any disclosure being made; and (e) is or has been independently developed by employees, consultants or agents of Recipient without violation of the terms of this Agreement or reference or access to any Confidential Information.

2.      Disclosure of Confidential Information. Recipient will: (a) limit disclosure of any Confidential Information to its directors, officers, employees, agents or representatives (collectively "Representatives") who have a need to know such Confidential Information in connection with the current or contemplated business relationship between the parties to which this Agreement relates; (b) advise its Representatives of the proprietary nature of the Confidential Information and of the obligations set forth in this Agreement and require such Representatives to keep the Confidential Information confidential; (c) keep all Confidential Information strictly confidential by using a degree of care not less than that used by it in safeguarding its own confidential information; and (d) not disclose any Confidential Information received by it to any third parties (except as otherwise provided herein). Each party will be responsible for any breach of this Agreement by their respective Representatives.

3.      Use of Confidential Information.  Recipient agrees to use the Confidential Information solely in connection with the current or contemplated business relationship between the parties and not for any purpose other than as authorized by this Agreement without the prior written consent of Disclosing Party. No other right or license, whether expressed or implied, in the Confidential Information is granted to Recipient hereunder. Title to the Confidential Information, including any modifications and improvements, will remain solely in Disclosing Party.

4.      Compelled Disclosure of Confidential Information.  Notwithstanding anything in the foregoing to the contrary, Recipient may disclose Confidential Information pursuant to any governmental, judicial, or administrative order, subpoena, discovery request, regulatory request or similar method, provided that Recipient

promptly notifies, to the extent practicable, Disclosing Party in writing of such demand for disclosure so that Disclosing Party, at its sole expense, may seek to make such disclosure subject to a protective order or other appropriate remedy to preserve the confidentiality of the Confidential Information. Recipient agrees that it will not oppose and will cooperate with efforts by, to the extent practicable, Disclosing Party with respect to any such request for a protective order or other relief. Notwithstanding the foregoing, if Disclosing Party is unable to obtain or does not seek a protective order and Recipient is legally requested or required to disclose such Confidential Information, disclosure of such Confidential Information may be made without liability.

5.      Term.  This Agreement will remain in effect for a term of two years. Notwithstanding the foregoing, the parties' duty to hold in confidence Confidential Information that was disclosed during this term will remain in effect indefinitely.

6.      Remedies.  Both parties acknowledge that the Confidential Information to be disclosed hereunder is of a unique and valuable character, and that the unauthorized dissemination of the Confidential Information would destroy or diminish the value of such Confidential Information. Damages to Disclosing Party that would result from the unauthorized dissemination of the Confidential Information would be impossible to calculate. Therefore, both parties hereby agree that Disclosing Party will be entitled to injunctive relief preventing the dissemination of any Confidential Information in violation of the terms hereof. Such injunctive relief will be in addition to any other remedies available hereunder, whether at law or in equity. Disclosing Party will be entitled to recover its costs and fees, including reasonable attorneys' fees, incurred in obtaining any such relief. Further, in the event of litigation relating to this Agreement, the prevailing party will be entitled to recover its reasonable attorney's fees and expenses.

7.      Return of Confidential Information.  Recipient will immediately return and redeliver to  Disclosing Party all tangible material embodying the Confidential Information provided hereunder and all notes, summaries, memoranda, drawings, manuals, records, excerpts or derivative information deriving there from and all other documents or materials ("Notes") (and all copies of any of the foregoing, including "copies" that have been converted to computerized media in the form of image, data or word processing files either manually or by image capture) based on or including any Confidential Information, in whatever form of storage or retrieval, at such time as the Disclosing Party may so request; provided however that the Recipient may retain such of its documents as is necessary to enable it to comply with its document retention policies, if any. Alternatively, Recipient, with the written consent of Disclosing Party may (or in the case of Notes, at Recipient's option) immediately destroy any of the foregoing embodying Confidential Information (or the reasonably nonrecoverable data erasure of computerized data) and, upon request, certify in writing such destruction by an authorized officer or Representative of Recipient supervising the destruction).

8.      Notice of Breach.  Recipient will notify the Disclosing Party immediately upon discovery of any unauthorized use or disclosure of Confidential Information by Recipient or its Representatives, or any other breach of this Agreement by Recipient or its Representatives, and will cooperate with efforts by the Disclosing Party to help the Disclosing Party regain possession of Confidential Information and prevent its further unauthorized use.

9.      No Binding Agreement for Transaction.  The parties agree that neither party will be under any legal obligation of any kind whatsoever with respect to a Transaction by virtue of this Agreement, except for the matters specifically agreed to herein. The parties further acknowledge and agree that they each reserve the right, in their sole and absolute discretion, to reject any and all proposals and to terminate discussions and negotiations with respect to a Transaction at any time. This Agreement does not create a joint venture or partnership between the parties. If a Transaction goes forward, the non-disclosure provisions of any applicable transaction documents entered into between the parties (or their respective affiliates) for the Transaction will supersede this Agreement. In the event such provision is not provided for in said transaction documents, this Agreement will control.

10.     Warranty.  Each party warrants that it has the right to make the disclosures under this Agreement.

NO WARRANTIES ARE MADE BY EITHER PARTY UNDER THIS AGREEMENT WHATSOEVER. The parties understand that no representation or warranty as to the accuracy or completeness of the Confidential Information is being made by Disclosing Party. Neither Party will have any liability to the other party or to the other party's Representatives resulting from any use of the Confidential Information except with respect to disclosure of such Confidential Information in violation of this Agreement.

11.    Miscellaneous.    (a)    This Agreement constitutes the entire understanding between the parties and supersedes any and all prior or contemporaneous understandings and agreements, whether oral or written, between the parties, with respect to the subject matter hereof. This Agreement can only be modified by a written amendment signed by the party against whom enforcement of such modification is sought.

(b)    The validity, construction and performance of this Agreement will be governed and construed in accordance with the laws of the State of Florida applicable to contracts made and without giving effect to any conflict of laws provisions thereof. The Federal and state courts located in Florida will have sole and exclusive jurisdiction over any disputes arising under the terms of this Agreement.

(c)    Any failure by either party to enforce the other party's strict performance of any provision of this Agreement will not constitute a waiver of its right to subsequently enforce such provision or any other provision of this Agreement.

(d)    If any restriction in this Agreement is found by a court of competent jurisdiction to be unenforceable, such provision will be modified, rewritten or interpreted to include as much of its nature and scope as will render it enforceable. If it cannot be so modified, rewritten or interpreted to be enforceable in any respect, it will not be given effect, and the remainder of the Agreement will be enforced as if such provision was not included.

(e)    Any notices required or permitted to be given hereunder may be delivered by hand, deposited with an overnight carrier, electronic-mail, or mailed by certified mail, return receipt requested, postage prepaid, to the address of the other party. All such notices will be deemed to have been given and received (1) in the case of personal delivery or electronic-mail, on the date of such delivery, or (2) in the case of delivery by overnight carrier or certified mail, on the third business day following tender.

(f)    Neither party may directly or indirectly assign or transfer this Agreement without the prior written consent of the other party, which consent will not be unreasonably withheld. All obligations contained in this Agreement will extend to and be binding upon the parties to this Agreement and their respective successors, assigns and designees.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

By: _____

Elton Potts, Managing Partner, Vine Vault LLC