1

**CALLAHAN & BLAINE, APLC**
Michael J. Sachs (SBN 134468)
mjs@callahan-law.com
John D. Van Ackeren (SBN 240793)
Jvanackeren@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444
Facsimile: (714) 241-4445

Attorneys for Defendants TWO 4 STU, LLC
and STUART JAY LERNER

2

3

4

5

6

7

8

9

10

11

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| HUNDRED ACRE WINE GROUP INC., a Delaware Corporation, | CASE NO.: 3:22-CV-07305-jd |
| Plaintiff, | Judge: James Donato |
| v. | **DEFENDANTS TWO 4 STU, LLC AND STUART LERNER'S OPPOSITION TO PLAINTIFF HUNDRED ACRE WINE GROUP, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| TWO 4 STU, LLC, a California limited liability company dba LERNER PROJECT; STUART JAY LERNER, an individual; VINE VAULT LLC, a Georgia limited liability company; and ELTON POTTS, an individual, | |
| Defendants. | Hearing Date:   February 2, 2023 |
| | Hearing Time:   10:00 a.m. |
| | Courtroom:   11 |
| | Complaint Filed:   November 18, 2022 |
| | Trial Date:   None Set |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   BACKGROUND ....................................................................................... 2

   A.   Factual Background ....................................................................... 2

       1.   Lerner's Professional Background .................................... 2

       2.   Formation of Lerner Project and Lerner Project Wines .............. 2

       3.   Development and Maintenance of Lerner Project's Customer Lists. ......... 3

       4.   Vine Vault ................................................................. 4

       5.   Vine Vault Events ........................................................ 5

       6.   Customers Obtained from Bevan ...................................... 6

       7.   Simpson's Involvement with Lerner Project ....................... 7

       8.   Simpson's Involvement with Lerner Project's Customer Lists ................. 7

       9.   Simpson's Separation from Lerner Project ........................ 8

       10.  Simpson's Attempted Theft of Lerner Project Wines ............ 10

       11.  Hate Mail Sent by Simpson to Lerner Project ................... 10

       12.  Simpson's Theft of Lerner Project's Trade Secrets ............... 11

   B.   Procedural Background ................................................................ 11

III.  LEGAL ARGUMENT ............................................................................. 12

   A.   Legal Standard for Injunctive Relief ............................................ 12

   B.   Application of the *Winter* Elements Establishes that Hundred Acre Is Not
        Entitled to Injunctive Relief. ...................................................... 13

       1.   Hundred Acre Is Not Likely to Succeed on the Merits of Its
            Misappropriation of Trade Secret Claims. ........................ 13

       2.   Hundred Ace Is Not Likely to Suffer Irreparable Harm in the
            Absence of Preliminary Relief. ..................................... 17

       3.   The Balance of Equities Tips in Lerner Project's Favor. .......... 18

       4.   An Injunction Is Not in the Public Interest. ....................... 19

   C.   Hundred Acre Unreasonably Delayed Seeking Injunctive Relief and Is
        Guilty of Unclean Hands ............................................................. 19

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

1

**TABLE OF CONTENTS**
**(CONTINUED)**

2

<u>**Page**</u>

3

      D.     In the Event the Court Is Inclined to Grant Injunctive Relief, Substantial
             Security from Hundred Acre Is Warranted. ........................................................... 21

4

IV.     CONCLUSION ............................................................................................................ 22

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Amoco Production Co. v. Village of Gambell, Alaska,*
   480 U.S. 531, 107 S.Ct. 1396 (1987) ................................ 12

*Apple, Inc. v. Samsung Electronics Co., Ltd.,*
   678 F.3d 1314 (Fed. Cir. 2012) .................................. 17

*Benisek v. Lamone,*
   201 L.Ed.2d 398, 138 S.Ct. 1942 (2018) ..................... 20

*Big Country Foods, Inc. v. Board of Ed. of Anchorage School Dist., Anchorage, Alaska,*
   868 F.2d 1085 (9th Cir. 1989) ................................ 17

*Continuum Co., Inc. v. Incepts, Inc.,*
   873 F.2d 801 (5th Cir. 1989) ................................. 21

*Dogloo, Inc. v. Doskocil Mfg. Co., Inc.,*
   893 F. Supp. 911 (CD CA 1995) ............................. 12

*Earth Island Institute v. Carlton,*
   626 F.3d 462 (9th Cir. 2010) ................................ 12

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388, 126 S.Ct. 1837 (2006) ....................... 13

*Garcia v. Google, Inc.,*
   786 F.3d 733 (9th Cir. 2015) ......................... 13, 14, 20

*Goldie's Bookstore, Inc. v. Sup. Ct.,*
   739 F.2d 466 (9th Cir. 1984) ................................ 17

*Horwitz v. Southwest Forest Indus., Inc.,*
   604 F. Supp. 1130 (D NV 1985) ............................ 19

*Institute of Cetacean Research v. Sea Shepherd Conservation Soc.,*
   725 F.3d 940 (9th Cir. 2013) ................................ 19

*Jordan v. Fisher,*
   823 F.3d 805 (5th Cir. 2016) ................................ 12

*LA Alliance for Human Rights v. County of Los Angeles,*
   14 F.4th 947 (9th Cir. 2021) ................................ 13

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Pages**

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*
    *Connaughton,*
    752 F.3d 755 (9th Cir. 2014)......................................................................... 19

*MacDonald v. Chicago Park Dist.,*
    132 F.3d 355 (7th Cir. 1997)......................................................................... 18

*Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.,*
    16 F.3d 1032 (9th Cir. 1994)......................................................................... 21

*Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies,*
    *Ltd.*
    970 F.2d 273 (7th Cir. 1992)......................................................................... 20

*Sargent Fletcher, Inc. v. Able Corp.,*
    110 Cal.App.4th 1658 (2003)....................................................................... 14

*Scotts Co. v. United Indus. Corp.,*
    315 F.3d 264 (4th Cir. 2002)......................................................................... 18

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 School Dist.,*
    696 F.3d 771 (8th Cir. 2012)......................................................................... 17

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7, 129 S.Ct. 365 (2008) ............................................................. *passim*

**Statutes**

18 U.S.C. § 1831............................................................................................. 15

18 U.S.C. § 1839............................................................................................. 15

Cal. Civ. Code § 3426.1 ................................................................................. 14

California Uniform Trade Secrets Act ................................................... 13, 14, 15

Federal Defend Trade Secrets Act ............................................................. 13, 15

Fed. R. Civ. Proc. 65 ...................................................................................... 21

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

1

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

# I.     <u>INTRODUCTION</u>

This action is a work of fiction based solely on the falsehoods of a deranged and disgruntled former consultant, Matthew Simpson ("Simpson"), who has an ax to grind and has set out on a path to harm his former winery and partner, Defendants Two 4 Stu, LLC dba Lerner Project ("Lerner Project") and Stuart Lerner ("Lerner").

Simpson– Plaintiff Hundred Acre Wine Group Inc.'s ("Hundred Acre") "star witness" and primary source of purported evidence in support of the Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") – was relieved of his duties as a sales and marketing consultant for Lerner Project in June 2020 because of lack of performance.  Nearly two years after his separation from Lerner Project, Simpson went to Hundred Acre's owner, Jayson Woodbridge, with a manufactured story about Lerner Project allegedly coming into possession of and using Hundred Acre's customer list.  Not only did Simpson lie to Woodbridge, he also disclosed Lerner Project's customer list (i.e., Lerner Project's trade secrets) that he stole to Woodbridge in violation of his separation agreements with Lerner Project, thereby subjecting himself to liability for breach of contract and misappropriation of trade secrets, amongst other claims.  Simply put, there is no basis in fact for Hundred Acre's allegations and claims against Lerner and Lerner Project.

As detailed below, there is absolutely no basis for issuing injunctive relief against Lerner or Lerner Project because:

- Hundred Acre is not likely to succeed on the merits of its misappropriation of trade secret claims against Lerner or Lerner Project;
- Hundred Acre is not likely to suffer irreparable harm in the absence of preliminary relief, as the alleged harm is purely speculative;
- The balance of equities tips in Lerner and Lerner Project's favor; and
- An injunction is not in the public interest.

- 1 -

1   Furthermore, Hundred Acre is guilty of laches and unclean hands, which preclude it

2   from obtaining injunctive relief.  Accordingly, the Motion should be denied.

3   **II.   BACKGROUND**

4       **A.   Factual Background**

5           **1.   Lerner's Professional Background**

6         Lerner has had a successful 40+ year career in the pallet industry.

7   (Declaration of Stuart Lerner filed concurrently herewith ("Lerner Dec.") ¶¶ 3-10.)

8   Companies he owned have supplied pallets to the wine industry and many other

9   market segments.  (Lerner Dec. ¶ 11.)  Over the course of his career, Lerner has

10  amassed a client and contact list in excess of 40,000 clients.  (*Id.*)

11        Lerner has been in Napa Valley supplying pallets and collecting wine since

12  1983.  (Lerner Dec. ¶ 12.)  He has networked with wineries in Napa Valley for

13  decades, and he has a tremendous number of contacts and friends at some of the

14  most prestigious wineries in the Valley.  (*Id.*)

15          **2.   Formation of Lerner Project and Lerner Project Wines**

16        Lerner formed Lerner Project along with his wife Karen Lerner and their

17  business partner Russell Bevan ("Bevan") in 2016.  (Lerner Dec. ¶ 13.)  Lerner has

18  been the Managing Member of Lerner Project since its formation.  (*Id.*)

19        Lerner Project is a boutique winery located in Napa Valley.  (Lerner Dec. ¶

20  14.)  Lerner and his wife purchased the Armstrong Ranch vineyard on Diamond

21  Mountain in Calistoga, California in 2017.  (*Id.*)  The vineyard produces world class

22  wines.  (*Id.*)

23        Bevan is Lerner Project's winemaker.  (Lerner Dec. ¶ 15.)  Bevan has

24  collected 23 100-point scores for his wines, and he was chosen as Wine Spectator's

25  Wine Maker of the Year in 2015.  (*Id.*)

26        Since 2016, Lerner Project wines have consistently received scores of 96 to

27  99 points from multiple critics.  (Lerner Dec. ¶ 16.)  In a short period of time, the

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   Lerner Project brand has grown from 1,000 cases of wine per year to 3,000 cases of

2   wine per year.  (Lerner Dec. ¶ 17.)  Since Simpson's departure from Lerner Project

3   (which is addressed in more detail below), Lerner Project's sales have risen from

4   $600,000 per year to $2,500,000 per year.  (*Id.*)

5        Lerner Project wines range from $95 to $425 per bottle.  (Lerner Dec. ¶ 18.)

6   All of Lerner Project's single vineyard wines score 97 points or higher and sell for

7   $275 per bottle.  (*Id.*)  Lerner Project's price point is the average for Napa Valley

8   premium wines.  (*Id.*)  Based on the price point for Lerner Project wines, the

9   primary purchasers of Lerner Project wines are in the top 1-2% of the wealthiest

10  individuals in the United States.  (Lerner Dec. ¶ 19.)

11       Lerner Project networks with over 30 other wineries that share the same type

12  of customers who are referred within that network.  (Lerner Dec. ¶ 20.)  For

13  example, Lerner Project customers also purchase wine from other exclusive

14  wineries such as Harlan, Colgin, Screaming Eagle, and Bryant Family.  (*Id.*)

15       **3.    Development and Maintenance of Lerner Project's Customer**

16            **Lists**

17       In 2018, Lerner Project subscribed to VineSpring, a commerce platform for

18  wineries, for the use of its customer relationship management ("CRM") and

19  customer database system.  (Lerner Dec. ¶ 21.)  All information regarding Lerner

20  Project customers needed to be input in the VineSpring CRM system, including the

21  customer's name, email address, and phone number.  (*Id.*)  Simpson was the point

22  person with VineSpring and maintained the customer information.  (Lerner Dec. ¶

23  22.)  He also ran all of Lerner Project's point-of-sale orders through VineSpring

24  until he was relieved of his duties on June 12, 2020.  (*Id.*)

25       During the first half of 2020, Lerner put together lists of potential customers

26  for Lerner Project wines from his extensive database and acquaintances from his

27  40+ years as a business owner to be input in the VineSpring CRM system.  (Lerner

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

Dec. ¶ 23.)  Lerner also received customer lists from numerous other sources, including Bevan, trade show events, road show events, auctions, wine tastings, country clubs, the Food and Marketing Institute, the Produce Association, pallet associations, the Lumberman's Association, Phi Delta Theta fraternity national members, and friends, as well as from Vine Vault as discussed below.  (Lerner Dec. ¶ 24.)  The lists typically included a name and email address, and sometimes a phone number and address.  (*Id.*)  These lists were also input in the VineSpring CRM system.  (*Id.*)  Additionally, Lerner Project receives a lot of clients from referrals from other wineries.  (Lerner Dec. ¶ 25.)  Lerner Project networks with over 30 wineries where Lerner Project and the wineries share in sales and customer lists.  (*Id.*)  Through these sources, over 5,000 customers were entered into Lerner Project's customer database in 2020.  (Lerner Dec. ¶ 26.)

### 4.   Vine Vault

Defendant Vine Vault LLC ("Vine Vault") offers wine storage, wine transport, winery services, sommelier services, retail items, and wine events. (Lerner Dec. ¶ 27.)  Defendant Elton Potts ("Potts") is the founder, majority owner, and Managing Member of Vine Vault and always has been since its formation in 2014.  (Declaration of Elton Potts filed concurrently herewith ("Potts Dec.") ¶ 2.) Since its formation, Potts has always owned a majority of the membership interests in Vine Vault, and he has always exercised full and complete authority and discretion regarding the management and control of the business.  (Potts Dec. ¶¶ 2, 3.)

Lerner and his wife Karen Lerner (collectively the "Lerners") are minority members in Vine Vault.  (Lerner Dec. ¶ 29.)  When they first invested in Vine Vault in 2015, they owned an approximately 5.5% membership interest.  (*Id.*)  Their membership interest in Vine Vault has always been less than 6%.  (Potts Dec. ¶ 5.) The Lerners have never been involved in the operations or management of Vine

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   Vault in any way whatsoever nor have they ever had access to any of Vine Vault's

2   books and records other than summary level financial statements they receive with

3   their annual K1.  (Lerner Dec. ¶ 30; Potts Dec. ¶ 6.)  Lerner has never been a

4   "majority owner" of Vine Vault as alleged in the Motion, and it can only be

5   presumed that intentional misrepresentation was made to Hundred Acre by Simpson

6   who knew that it was false based on his extensive involvement with Vine Vault as a

7   Lerner Project consultant as described below.  (Lerner Dec. ¶ 29.)

8              **5.    Vine Vault Events**

9          As part of Vine Vault's business, Vine Vault holds "road show" and wine

10  dinner events in cities to promote wines from various participating wineries.  (Potts

11  Dec. ¶¶ 14-16; Lerner Dec. ¶ 31.)  These events range from 60 to 300 people.  (*Id.*)

12  Vine Vault sends participating wineries the guest lists, including email addresses,

13  for the events ahead of time.  (Potts Dec. ¶ 18; Lerner Dec. ¶ 31)  The guest lists are

14  derived from all of the participating wineries.  (*Id.*)  There are typically at least ten

15  wineries participating at each Vine Vault road show event.  (Potts Dec. ¶ 16; Lerner

16  Dec. ¶ 32.)  The wineries that participate in the events sell wine for over $200 per

17  bottle.  (*Id.*)  Lerner Project networks with most of the wineries that attend the

18  events, and the wineries constantly give referrals to each other.  (Lerner Dec. ¶ 34.)

19         Lerner Project attended and marketed its wines at a number of Vine Vault

20  road show events in Florida, Georgia, and Texas starting in the first quarter of 2020.

21  (Lerner Dec. ¶ 35; Potts Dec. ¶ 18.)  As a result, Lerner Project received guest lists

22  from Vine Vault for the road show events Lerner Project attended.  (*Id.*)  Lerner

23  Project also participated in Vine Vault wine dinners in Atlanta and Austin.  (Lerner

24  Dec. ¶ 36; Potts Dec. ¶ 19.)  Lerner Project received the guest lists for these dinners

25  as well.  (*Id.*)

26         Lerner Project received at least one email in 2018 and at least 10 emails from

27  Vine Vault in the first quarter of 2020 attaching guest lists for Vine Vault events

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

1    that included the names and contact information of over 2,100 guests.  (Lerner Dec.

2    ¶ 37; Potts Dec. ¶ 18.)  It is important to note that these lists were also emailed to all

3    of the other wineries that attended the events in 2020.  (*Id.*; Compendium of

4    Exhibits filed concurrently herewith ("Compendium"), Ex. A.)  It is also important

5    to note that these emails were also sent to Simpson.  (Lerner Dec. ¶ 37.)  Upon

6    receiving Vine Vault road show and wine dinner guest lists, some of the guests'

7    contact information was entered into Lerner Project's customer database.  (Lerner

8    Dec. ¶ 38.)

9           The guest lists from the Vine Vault road show and wine dinner events are the

10   only Vine Vault customer-related data Lerner Project representatives and the

11   Lerners and Lerner Project have ever had access to or received from Vine Vault or

12   Potts.  (Lerner Dec. ¶ 39.)  They have never had access to or received any other

13   customer data from any of the other services Vine Vault provides.  (*Id.*)  Lerner was

14   not aware that there was a non-disclosure agreement between Vine Vault and

15   Hundred Acre until he read that in the Complaint and motion papers filed by

16   Hundred Acre in this action.  (Lerner Dec. ¶ 40; Potts Dec. ¶ 24.)

17                    **6.      Customers Obtained from Bevan**

18          Given his celebrity in the wine industry, Lerner requested Bevan attend the

19   Vine Vault road show events with other Lerner Project representatives when he was

20   available.  (Lerner Dec. ¶ 41.)  In connection with that request, Lerner asked Bevan

21   to provide him with the names, email addresses, and phone numbers of his friends

22   and clients in Florida, Georgia, and Texas so that Lerner Project could make sure

23   they were invited to the events and so they would receive notifications of Lerner

24   Project's wine releases.  (Lerner Dec. ¶ 42.)

25          Starting in November 2019 and in the months that followed, Bevan provided

26   Lerner the names and contact information of his friends and clients in Miami,

27   Naples, Tampa, Jacksonville, West Palm Beach, and Atlanta.  (Bevan Dec. ¶¶ 6-9;

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

1    Lerner Dec. ¶ 43.)  That information was then added to Lerner Project's master

2    customer list.  (Lerner Dec. ¶ 43.)

3              **7.    Simpson's Involvement with Lerner Project**

4    Simpson was brought on as a sales consultant to Lerner Project in 2016 with a

5    salary of $8,000 per month.  (Lerner Dec. ¶ 43.)  His compensation increased to

6    $12,000 per month in 2017.  (*Id.*)  His duties included overseeing sales and

7    marketing.  (*Id.*)  Simpson also made a $10,000 investment for a minority

8    membership interest in the company.  (*Id.*)

9    Simpson made a lot of promises to Lerner that he had clients in Florida,

10   Georgia, and Texas and that he would be able to greatly increase sales.  (Lerner Dec.

11   ¶ 44.)  As time went on, it was clear that these were empty promises as Simpson's

12   sales never came to fruition.  (*Id.*)

13   Simpson claimed that he could generate over $2,500,000 in wine sales

14   annually.  (Lerner Dec. ¶ 45.)  However, in the three years that he was with Lerner

15   Project, Simpson only generated a total of $250,000 in sales.  (*Id.*)  This was highly

16   problematic since Simpson's consulting fee was far in excess of the sales he

17   generated.  (*Id.*)

18             **8.    Simpson's Involvement with Lerner Project's Customer Lists**

19   In connection with his marketing and sales efforts, Simpson was involved in

20   building and maintaining Lerner Project's customer lists.  (Lerner Dec. ¶ 46.)  For

21   example, in February 2020, Simpson asked Lerner to enter potential clients in

22   Lerner Project's point-of-sale system, VineSpring, so they would receive Lerner

23   Project's invitations to Vine Vault's road show events in Florida, Georgia, and

24   Texas, and Lerner Project's release letter to purchase newly released 2018 wines.

25   (Lerner Dec. ¶ 47.)

26   Simpson knew that Lerner Project received guest lists from the Vine Vault

27   road show events because he participated in all of the events and was included on

28

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

the emails from Vine Vault to all the wineries attaching the guest lists.  (Lerner Dec.
¶ 48.)  Simpson would input the names, addresses, email addresses, and phone
numbers to Lerner Project's customer list.  (*Id.*)  Simpson also sent emails from
Lerner Project to the guests from the events.  (*Id.*)  Additionally, Simpson called
guests to try to sell them wine.  (*Id.*)

Lerner never told Simpson that he had a Hundred Acre customer list, and
Lerner never instructed Simpson to input customers from any Hundred Acre
customer list into Lerner Project's customer database, whether VineSpring or
otherwise.  (Lerner Dec. ¶ 49.)  Simpson's statements to that effect are false and
appear to be part of a pattern of his to try and harm Lerner Project.  (*Id.*)

### 9.    Simpson's Separation from Lerner Project

Lerner wanted to release Simpson from his duties in November 2019, but he
was persuaded to give him another six months to see if he could make the necessary
changes to prove his worth to the company.  (Lerner Dec. ¶ 50.)  Simpson failed to
do so.  (*Id.*)

Simpson was relieved of his duties as a consultant with Lerner Project on
June 12, 2020 due solely to his poor performance with sales and marketing.  (Lerner
Dec. ¶ 51.)  When Simpson was relieved of his consulting duties, his company email
and access to VineSpring were terminated on that same date.  (Lerner Dec. ¶ 53.)

Despite being relieved of his consulting duties, Lerner advised Simpson he
could maintain his 10% ownership position with Lerner Project.  (Lerner Dec. ¶ 54.)
In response, Simpson advised Lerner that he did not want to be part of the business
if he was not allowed to work any longer.  (*Id.*)  Negotiations over his complete
separation from the company ensued.  (*Id.*)

Simpson did not take the separation well.  (Lerner Dec. ¶ 55.)  On June 19,
2020, Simpson sent Lerner a letter regarding their ongoing negotiations over the
terms of his separation from Lerner Project.  (*Id.*)  In the letter, Simpson made

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   concerning comments about his mental state and threatening comments if Lerner did

2   not comply with his payment demands, including the following:

> I'm pretty sure that you are aware that 2020 has been a
> very challenging year for me physically and mentally.  I
> finally made contact with the therapist who helped me
> when I first moved to CA.  I hope she's a better healer
> now than she was 20 years ago.
>
> …
>
> **I would like you to know that you have cost me the 2
> most important things in my life.  My passion for wine
> and the love of my wife.**  Both may have been irreparably
> damaged in the last week.   She will not speak to me and
> every sip of wine tastes off.  **Everything in my life is
> quite dark right now.**
>
> I had intended to ask for my 18L of Tench.  But now when
> I see it there is nothing beautiful about it anymore.  It just
> makes my heart hurt.
>
> …
>
> **If you leave me a minority partner I know what will
> happen.  I will become bitter and dark.  I will become a
> constant thorn in your side.  That's not what I want
> and I'm pretty sure you don't want that either.**
>
> **I do not want to be an impediment to your success.**
>
> **The wine community is quite small and I would really
> like to be able to tell people we parted on good terms.**

19   (Lerner Dec. ¶ 55; Compendium, Ex. B (emphasis added).)  It should be noted that

20   Simpson makes no mention in this letter of allegedly being terminated for not

21   inputting Hundred Acre client lists into Lerner Project's CRM system.  (*Id.*)

22          Simpson and Lerner finally agreed on a purchase price for his membership

23   interest.  (Lerner Dec. ¶ 56.)  In order to effectuate his separation and the sale of his

24   membership interest, Simpson entered into a Release Agreement dated July 24,

25   2020, a Membership Purchase Agreement dated July 24, 2020, and an Assignment

26   of Membership dated July 28, 2020.  (*Id.*; Compendium, Exs. C, D, and E,

27   respectively.)  The Release Agreement and the Membership Purchase Agreement

28

- 9 -

1  contain the same non-disparagement provisions, and the Membership Purchase

2  Agreement contains a provision requiring Simpson to return all Lerner Project

3  customer information.  (Lerner Dec. ¶¶ 57-58; Compendium, Exs. C and D.)

4       Lerner Project paid Simpson $60,000, six times the investment he made into

5  the business for his 10% interest, and he made almost $450,000 in consulting fees in

6  his three years with the company.  (Lerner Dec. ¶ 59.)  Yet, for some inexplicable

7  reason, Simpson was bitter that Lerner Project relieved him of his consulting duties.

8  (*Id.*)

9       **10.**   **Simpson's Attempted Theft of Lerner Project Wines**

10       In July 2020, just after his separation from Lerner Project, Simpson tried to

11  steal Lerner Project large format wine bottles that had been shipped to an etching

12  company before his separation.  (Lerner Dec. ¶¶ 60-68.)  The bottles were never

13  etched because Simpson instructed the company not to.  (*Id.*)  Instead of returning

14  the bottles to Lerner Project, Simpson had the bottles picked up by a friend and

15  delivered to his personal residence.  (*Id.*)  Upon being caught by Lerner, Simpson

16  reluctantly agreed to return all the bottles.  (*Id.*)

17       **11.**   **Hate Mail Sent by Simpson to Lerner Project**

18       In August 2022, a vulgar, anonymous, handwritten note addressed to

19  Simpson's replacement, Brigid Babb, was delivered to Lerner Project's post office

20  box in Napa.  The note states the following:

21          Cunt! Move on down the Road + fuck someone else's shit
22          up. Can't understand how u r even employable.

23          Fat cunt

24          Chunk

25  (Lerner Dec. ¶ 69; Compendium, Ex. F.)  While based on the timing of the delivery

26  of the note and the content, Lerner believes there is a strong probability Simpson

27  authored the note.  (*Id.*; Compendium, Exs. F and G.)  A handwriting expert has

28

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

now confirmed that Simpson wrote the note: "Based on a thorough analysis of the documents submitted to me, my professional expert opinion is that there is a strong probability the Matt Simpson of the known comparison writing samples did author the anonymous writings on the questioned document."  (Declaration of Beth Chrisman filed concurrently herewith at ¶ 4.)  This is confirmation of Simpson's irrational grudge against Lerner and Lerner Project and the fact that it is unrelated to any customer lists.

### 12.    Simpson's Theft of Lerner Project's Trade Secrets

As set forth above, Simpson contractually obligated himself to not disparage Lerner Project and to return all of Lerner Project's customer information to the company after his separation.  (Lerner Dec. ¶ 72; Compendium Exs. C and D.)

It is believed that Simpson first contacted Hundred Acre's principal, Woodbridge, in or around the spring of 2022.  (Lerner Dec. ¶ 73.)  Simpson stole Lerner Project's customer information from VineSpring and gave it to Woodbridge based on their admissions in their declarations filed in support of the subject Motion.  (Lerner Dec. ¶ 74.)  Lerner Project considers its customer list and customer information to be trade secrets and treats them as such.  (Lerner Dec. ¶ 75.)

### B.    Procedural Background

On December 12, 2022, Hundred Acre filed the Motion.  (Dkt. No. 14.)  The Motion is noticed for hearing on February 2, 2023.  (*Id.*)

Hundred Acre served Lerner Project and Lerner with the Summons and Complaint by substitute service on December 16, 2022.  (Lerner Dec. ¶ 81.)  Notwithstanding the fact that the Motion was filed four days earlier on December 12, 2022, Hundred Acre did not serve the Motion on Lerner Project and Lerner concurrently with the Complaint.  (*Id.*)  Rather, Hundred Acre waited until December 21, 2022 to serve Lerner Project and Lerner with the Motion.  (*Id.*)  This was likely intentional.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

It should be noted that Hundred Acre has already brought an Ex Parte Application for Order to Seize Property Necessary to Prevent Dissemination of Trade Secrets based on similar arguments in the Motion without providing any notice to Lerner or Lerner Project.  (Dkt. No. 10.)  On December 9, 2022, the Court denied Hundred Acre's Ex Parte Application and directed Hundred Acre to "serve a copy of this order on defendants as soon as practicable …."  (Dkt. No. 11.)  Hundred Acre waited 12 days and served the Court's Order on Lerner and Lerner Project concurrently with the Motion.  Clearly, there is no exigency or real threat of harm necessitating the relief sought in the Motion.

## III.   **LEGAL ARGUMENT**

### A.   **Legal Standard for Injunctive Relief**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 376 (2008); see *Earth Island Institute v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (plaintiffs "face a difficult task in proving that they are entitled to this 'extraordinary remedy'"); see also *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (preliminary injunction not granted unless moving party "clearly carried" burden of persuasion on all requirements).  An injunction never issues as a matter of course:

> In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  Although particular regard should be given to the public interest … a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.

*Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542, 107 S.Ct. 1396, 1402 (1987); *Dogloo, Inc. v. Doskocil Mfg. Co., Inc.*, 893 F. Supp. 911, 917 (CD CA 1995).

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

**B.    Application of the *Winter* Elements Establishes that Hundred Acre Is Not Entitled to Injunctive Relief.**

Under the "traditional test," a plaintiff seeking a preliminary injunction "must establish" the following:

- "that he is likely to succeed on the merits";
- "that he is likely to suffer irreparable harm in the absence of preliminary relief";
- "that the balance of equities tips in his favor"; and
- "that an injunction is in the public interest."

*Winter*, *supra*, 555 U.S. at 20, 129 S.Ct. at 374; see also *LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021).  This four-part or "traditional test" has been held to apply whenever preliminary injunctive relief is sought.  See *Winter*, *supra*, 555 U.S. at 20, 129 S.Ct. at 374 (to enjoin U.S. Navy from violations of environmental laws); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 1839 (2006) (to enjoin patent or copyright infringement).  As shown below, Hundred Acre is not entitled to injunctive relief based on application of the four elements espoused by the Supreme Court in the *Winter* case.

**1.    Hundred Acre Is Not Likely to Succeed on the Merits of Its Misappropriation of Trade Secret Claims.**

Hundred Acre's Motion is based on its claims that the defendants misappropriated its trade secrets in violation of the California Uniform Trade Secrets Act and the federal Defend Trade Secrets Act.  To obtain a preliminary injunction, Hundred Acre must show that it is "likely" to prevail on the merits. *Winter*, *supra*, 555 U.S. at 20, 129 S. Ct. at 374; *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (under *Winter*, likely success on merits is "most important" factor)  Because it is a threshold issue, **if the plaintiff fails to show likelihood of**

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

1  **success, the court generally need not consider the other three *Winter* elements.**

2  *Garcia*, *supra*, 786 F.3d at 740.

3        Under the California Uniform Trade Secrets Act ("CUTSA"), it is unlawful to

4  acquire a trade secret by means one knows or has reason to know are improper.  Cal.

5  Civ. Code § 3426.1(b)(1).  Plaintiff bears the burden of proving the alleged

6  misappropriation.  *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal.App.4th 1658, 1669

7  (2003).  "Improper means" include "theft, bribery, misrepresentation, breach or

8  inducement of a breach of a duty to maintain secrecy, or espionage through

9  electronic or other means."  Cal. Civ. Code § 3426.1(a).  Further, a person may not

10  "disclose" or "use" a trade secret without the owner's express or implied consent, if

11  the person:

12      •  improperly acquired knowledge of the trade secret; or

13      •  knew or had reason to know the knowledge was acquired under

14         circumstances giving rise to a duty to maintain its secrecy or limit its use;

15         or

16      •  knew or had reason to know knowledge of the trade secret came from a

17         person who used improper means to acquire it; or

18      •  knew or had reason to know the knowledge came from a person who owed

19         a duty to maintain the trade secret's secrecy or limit its use.

20  Cal. Civ. Code § 3426.1(b)(2).

21        However, under CUTSA, it is not improper and therefore not unlawful to

22  reverse engineer a trade secret or otherwise develop another's trade secret through

23  independent means.  Reverse engineering and "independent derivation" (i.e.,

24  independent development) are expressly excluded from the definition of "improper"

25  means (Cal. Civ. Code § 3426.1(a)) and negate the "misappropriation" element of

26  the claim.  See *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal.App.4th 1658, 1669

27  (2003) ("Proof that defendant's use resulted from independent derivation or reverse

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

engineering is evidence that there was no improper use on [defendant's] part").

The Defend Trade Secrets Act ("DTSA") is the federal equivalent of the CUTSA.  18 U.S.C. § 1831, et seq.  Under the DTSA, misappropriation is defined as follows:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
> (I) derived from or through a person who had used improper means to acquire the trade secret;
>
> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that—
>
> (I) the trade secret was a trade secret; and
>
> (II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5).  Under the DTSA, "improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  18 U.S.C. § 1839(6).  But "improper means" does not include "reverse engineering, independent derivation, or any other lawful means of acquisition."  *Id.*

Here, other than the completely fabricated story by Simpson, a deranged ex-consultant who has an ax to grind, there is no evidence Lerner or Lerner Project ever

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1    acquired Hundred Acre's trade secrets in any manner, let alone by "improper

2    means."  Lerner has never even seen or received any Hundred Acre customer list

3    from Vine Vault or any other source.  (Lerner Dec. ¶¶ 49, 78; Potts Dec. ¶¶ 22-23.)

4    Moreover, Lerner was not even aware of the existence of any non-disclosure

5    agreement between Vine Vault and Hundred Acre until he received Hundred Acre's

6    filings in this lawsuit.  (Lerner Dec. ¶ 40; Potts Dec. ¶ 24.)

7            Lerner Project's customer list was derived solely from legitimate sources, **not**

8    Hundred Acre's list.  Those sources include Lerner's personal acquaintances and

9    business contacts, Lerner Project's winemaker's contacts, wine industry referrals,

10   Vine Vault event guest lists, and other legitimate sources. (Lerner Dec. ¶¶ 11-12,

11   23-26, 37, 41-42; Bevan Dec. ¶¶ 6-9; Potts Dec. ¶¶ 18-19.)  Indeed, during the

12   timeframe Simpson falsely claims Lerner received Hundred Acre's customer list and

13   input that information into Lerner Project's customer database, Lerner received over

14   2,100 names and contact information from the guest lists received from Vine Vault

15   for the road show events Lerner Project was going to attend, which were input into

16   Lerner Project's database.  (Lerner Dec. ¶ 37.)[1]

17           Hundred Acre's argument regarding its purported "statistical evidence of

18   misappropriation" is irrational.  (See Motion at 5:17-6:11.)  If Lerner Project

19   received Hundred Acre's customer list, why would Lerner Project only input half of

20   the customers in its CRM system and not the entire list?  The answer is simple.  Any

21   common customer names came from other legitimate and lawful sources.

22           Furthermore, Lerner Project and Hundred Acre presumably share some of the

23   same customers as they both make world class wines.  (Lerner Dec. ¶ 79; Potts Dec.

24   ¶¶ 8-9, 12, 13-16.)  Lerner Project and Hundred Acre are in the same wine

25

26   [1] Hundred Acre claims that from on or about February 3, 2020 to February 14, 2020, Lerner or his
     agents added more than 900 customer names to Lerner Project's CRM.  (Motion at 5:18-20.)
27   Simpson claims in his Declaration that it was 927 names.  (Simpson Dec. at ¶ 3.)  The guest lists
     Lerner Project and Simpson received from Vine Vault for Vine Vault events on October 31, 2018,
28   January 13, 2020, and February 6, 2020 contain 928 guest names.  (See Compendium, Ex. A.)

1   publications and use the same critics to rate their wines.  (*Id.*)  All of Lerner

2   Project's customers purchase wines from other quality wineries, and the exact same

3   thing can be said about Hundred Acre.  (*Id.*)  Given that Lerner Project and Hundred

4   Acre both produce high end wines and cater to the same type of customer, it is

5   highly likely that there are customers on Lerner Project's customer list that also

6   appear on Hundred Acre's customer list.  Indeed, a wine industry expert opined that

7   "some overlap in [Hundred Acre and Lerner Project's] respective client lists is likely

8   to be organic."  (Declaration of Julie Lumgair filed concurrently herewith at ¶ 4.)

9        For these reasons, Hundred Acre's misappropriation of trade secret claims are

10  meritless, and Hundred Acre has failed to satisfy the first *Winter* element.

### 2.   Hundred Ace Is Not Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief.

13       Hundred Acre must demonstrate that irreparable injury is likely in the absence

14  of an injunction.  *Winter*, *supra*, 555 U.S. at 22, 129 S.Ct. at 375; see *Apple, Inc. v.*

15  *Samsung Electronics Co., Ltd.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (movant must

16  make "clear showing" of likelihood of irreparable harm).  A preliminary injunction

17  may not be granted based on a "possibility" of irreparable harm, even if plaintiff

18  demonstrates a strong likelihood of prevailing on the merits.  This is because

19  injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

20  showing that the plaintiff is entitled to such relief."  *Winter*, *supra*, 555 U.S. at 22,

21  129 S.Ct. at 375-76.

22       Further, there must be evidence of actual injury to support claims of

23  "irreparable" injury.  Speculative losses are insufficient.  *Goldie's Bookstore, Inc. v.*

24  *Sup. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984) (findings that plaintiff would lose

25  goodwill and "untold" customers held speculative); *S.J.W. ex rel. Wilson v. Lee's*

26  *Summit R-7 School Dist.*, 696 F.3d 771, 779 (8th Cir. 2012); *Big Country Foods,*

27  *Inc. v. Board of Ed. of Anchorage School Dist., Anchorage, Alaska*, 868 F.2d 1085,

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1    1088 (9th Cir. 1989) (loss of contract not sufficient injury where no evidence that

2    contract would have been profitable).

3       Here, Hundred Acre has utterly failed to present any evidence of any actual

4    harm it has suffered from the alleged misappropriation.  Indeed, that section of the

5    Motion is devoid of any citations to declarations, customer complaints, or financial

6    data to support the bald claims of "irreparable harm."  (See Motion at 9:16-10:27.)

7    The alleged harm is purely speculative.  Hundred Acre admits as much by claiming

8    "Plaintiff **has reason to believe** that Defendants will continue to make unauthorized

9    use or disclosure of Plaintiff's trade secrets …."  (Motion at 10:20-21.)  Hundred

10   Acre has therefore failed to satisfy the second *Winter* element.

### 3.    <u>The Balance of Equities Tips in Lerner Project's Favor.</u>

12       Before a preliminary injunction may issue, the court must identify the harm

13   that a preliminary injunction might cause the defendant and weigh it against

14   plaintiff's threatened injury.  "[T]he real issue in this regard is the degree of harm

15   that will be suffered by the plaintiff or the defendant if the injunction is *improperly*

16   granted or denied." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir.

17   2002) (emphasis in original); see *Winter*, *supra*, 555 U.S. at 24, 129 S.Ct. at 376

18   (2008).  Where the harm likely to be suffered by defendant substantially outweighs

19   any injury threatened by defendant's conduct, plaintiff must make a stronger

20   showing of likely success on the merits. *MacDonald v. Chicago Park Dist.*, 132

21   F.3d 355, 357 (7th Cir. 1997).

22       Issuance of the injunction Hundred Acre seeks will significantly interfere

23   with Lerner Project's ability to market and sell to any of its customers whose contact

24   information was independently derived and lawfully obtained but coincidentally

25   also appear on Hundred Acre's list.  This will damage Lerner Project in the form of

26   lost sales and also damage its customer relationships and reputation.  Such harm to

27   Lerner Project is actual and irreparable, unlike the speculative harm Hundred Acre

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1  claims.

2  **4.    An Injunction Is Not in the Public Interest.**

3      In exercising their sound discretion, courts of equity "pay particular regard for

4  the public consequences in employing the extraordinary remedy of injunction."

5  *Winter*, 555 U.S. at 24, 129 S.Ct. at376-77.  This "public interest" inquiry generally

6  addresses the impact upon nonparties of granting or withholding injunctive relief.

7  *League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*

8  *Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).  Thus, injunctive relief may be

9  refused where it would adversely affect the rights of persons who are not parties to

10  the litigation.  *Horwitz v. Southwest Forest Indus., Inc.*, 604 F. Supp. 1130, 1136 (D

11  NV 1985).

12      In *Horwitz*, a shareholder's motion to enjoin a corporation from taking certain

13  actions was denied where (i) plaintiff showed only a "possibility" of irreparable

14  injury, and (ii) the relief sought would cause confusion to the investing public and

15  financial institutions dealing in the corporation's stock.  "To allow one shareholder

16  to incapacitate an entire board of directors merely by leveling charges against them

17  gives too much leverage to dissident shareholders." *Id.* at 1136.

18      The same result in *Horwitz* is warranted here.  Hundred Acre has showed only

19  a possibility of injury, and the injunctive relief sought will affect the ability of wine

20  consumers to purchase Lerner Project wines.  Allowing the baseless accusations of a

21  former consultant to irreparably harm the business of Lerner Project is not in the

22  public interest and should not be endorsed.

23  **C.    Hundred Acre Unreasonably Delayed Seeking Injunctive Relief**
24  **and Is Guilty of Unclean Hands.**

25      Traditional equitable considerations such as laches and unclean hands militate

26  against issuing a preliminary injunction that otherwise would meet preliminary

27  injunction standards.  See *Institute of Cetacean Research v. Sea Shepherd*

28

- 19 -

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

1    *Conservation Soc.*, 725 F.3d 940, 947 (9th Cir. 2013).  While Lerner and Lerner

2    Project contend the standards have not been met, in the event the Court finds they

3    have, there are strong defenses to granting Hundred Acre injunctive relief.

4         With regard to the laches defense, the Supreme Court has emphasized that "a

5    party requesting a preliminary injunction must generally show reasonable

6    diligence."  *Benisek v. Lamone*, 201 L.Ed.2d 398, 138 S.Ct. 1942, 1944 (2018)

7    (upholding denial of preliminary injunction to plaintiffs whose challenge of

8    redistricting decision was brought "six years, and three general elections" after new

9    district map was adopted).  Furthermore, unexplained delay in seeking preliminary

10   injunctive relief may undercut claims that plaintiff is threatened with "irreparable

11   injury."  *Garcia*, *supra*, 786 F.3d 733, 746 (9th Cir. 2015).  Here, Hundred Acre's

12   principal Woodbridge claims he learned of the alleged misappropriation by Lerner

13   in or around June 2022.  (Motion at 6:23-7:4; Woodbridge Dec. at ¶ 17.)  However,

14   Hundred Acre waited until December 12, 2022, almost six months later, to bring this

15   Motion.  Hundred Acre offers zero explanation for this unreasonable delay in its

16   moving papers.  Clearly, there is no threat of irreparable injury.

17        The unclean hands defense "is as relevant to preliminary as to final relief."

18   *Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies,*

19   *Ltd.*, 970 F.2d 273, 281 (7th Cir. 1992).  Simpson stole Lerner Project's customer

20   information (i.e., Lerner Project's trade secrets) and shared it with Woodbridge.

21   (Simpson Dec. at ¶ 4; Woodbridge Dec. at ¶ 17.)  Woodbridge certainly knew that

22   such information was improperly obtained by Simpson.  Hundred Acre nevertheless

23   used the misappropriated Lerner Project trade secrets in support of the Motion.

24   Hundred Acre is therefore guilty of unclean hands and should be precluded from

25   obtaining injunctive relief against Lerner and Lerner Project.

26

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd

**D.** **In the Event the Court Is Inclined to Grant Injunctive Relief, Substantial Security from Hundred Acre Is Warranted.**

No party may be granted a temporary restraining order or preliminary injunction without first posting security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. Proc. 65(c).

The purpose of the bond requirement is threefold:

- First, to discourage the moving party from seeking preliminary injunctive relief to which it is not entitled;
- Second, to assure the court that if it errs in granting such relief the moving party rather than the wrongfully-enjoined party will bear the cost of the error; and
- Third, to provide a wrongfully-enjoined party a source from which it may readily collect damages without further litigation and without regard to the moving party's solvency.

*Continuum Co., Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989); *Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1037 (9th Cir. 1994).

As set forth above, Hundred Acre is not entitled to injunctive relief against Lerner or Lerner Project. However, in the event the Court is inclined to grant Hundred Acre injunctive relief, such relief will be detrimental to Lerner and Lerner Project, as they will be forced to incur considerable fees and costs defending this meritless action, and an injunction will cause irreparable damage to their business and reputations. Accordingly, a substantial bond is warranted if injunctive relief is granted.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Hundred Acre's Motion should be denied.

Dated:  January 6, 2023

**CALLAHAN & BLAINE, APLC**

By: _____

Michael J. Sachs
John D. Van Ackeren
Attorneys for Defendants TWO 4 STU,
LLC and STUART JAY LERNER

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

LERNER PROJECT AND LERNER'S OPPOSITION TO HUNDRED ACRE'S
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3:22-CV-07305-jd