**CALLAHAN & BLAINE, APLC**
Michael J. Sachs (SBN 134468)
mjs@callahan-law.com
John D. Van Ackeren (SBN 240793)
Jvanackeren@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444
Facsimile: (714) 241-4445

Attorneys for Defendants TWO 4 STU, LLC
and STUART JAY LERNER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| HUNDRED ACRE WINE GROUP INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>TWO 4 STU, LLC, a California limited liability company dba LERNER PROJECT; STUART JAY LERNER, an individual; VINE VAULT LLC, a Georgia limited liability company; and ELTON POTTS, an individual,<br><br>Defendants. | CASE NO.: 3:22-CV-07305-jd<br><br>Judge: James Donato<br><br>**DECLARATION OF STUART LERNER IN SUPPORT OF DEFENDANTS TWO 4 STU, LLC AND STUART LERNER'S OPPOSITION TO PLAINTIFF HUNDRED ACRE WINE GROUP, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Hearing Date: February 2, 2023<br>Hearing Time: 10:00 a.m.<br>Courtroom: 11<br><br>Complaint Filed: November 18, 2022<br>Trial Date: None Set |

DECLARATION OF STUART LERNER - 3:22-CV-07305-jd

I, Stuart Lerner, declare:

1. I am a party to this action. If called as a witness, I could and would competently testify to the following facts based on my personal knowledge except as to those facts stated on information and belief, in which case I believe those facts to be true.

2. I have reviewed the Complaint and Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") filed by Plaintiff Hundred Acre Wine Group, Inc. ("Hundred Acre") in the above-captioned lawsuit and I am familiar with the allegations and claims made therein. I make this Declaration in support of the Opposition to Hundred Acre's Motion.

## **BACKGROUND**

3. I have worked in the pallet industry for 40 years.

4. From 1983 to 1987, I was the sales manager for Sonoma Pacific Company. During my time with the company, I increased sales from $4 million to $16 million.

5. From, 1987 to 1994, I owned and operated L&M Pallet Company. L&M was a start-up pallet company that grew to $40 million in sales, becoming the largest new pallet manufacturer in the United States.

6. From 1994 to 1996, I worked as a consultant for Tanimura and Antle (T&A), the nation's second largest produce company. I was hired by the company's board of directors to help determine best practices for the company's produce operations. During my tenure, I helped save the company over $40 million.

7. From 1996 to 2014, I started a number of pallet businesses. During that timeframe, I owned and operated Blue Chip Manufacturing, Blue Chip Recycling, Blue Chip II, Blue Chip III, Blue Chip Southwest, Blue Chip Midwest and Blue Chip TPM. The companies manufactured and recycled pallets for CHEP USA, the largest pallet rental company in the world. These companies manufactured 60 million pallets and employed 765 employees from 2003 to 2014,

and company sales were $80 million annually. The companies won awards every year from CHEP for being the best third party management group in the network.

8. In 2013, I started Product Protector, which manufactured forklift devices to lower product damage in a market where damage is over $10 billion annually. I sold the company in 2016. The company won multiple innovation awards in the material handling and manufacturing industry.

9. From 2014 to present, I have worked as a consultant and board member for a start-up, PalX (formerly Palex). I resigned from the board on June 1, 2022.

10. Over the course of my career, my companies have been recognized as leaders in the National Wooden Pallet and Container Association (NWPCA) and Western Pallet Association (WPA), and I have held many roles in both pallet associations. I have also served as a consultant for the pallet and produce industries, and I have been retained as an expert witness for pallet and lumber companies.

11. My companies have supplied pallets to the wine industry, produce industry, food manufacturing industry, printing industry, lumber industry, building industry, military, and other market segments. I have amassed a client list in excess of 40,000 clients during my 40 years in the pallet business.

12. I have been in Napa Valley supplying pallets and collecting wine since 1983. I have networked with wineries in Napa Valley for decades, and I have a tremendous number of contacts and friends at some of the most prestigious wineries in the Valley.

**FORMATION OF LERNER PROJECT AND LERNER PROJECT WINES**

13. I formed Two 4 Stu, LLC, which does business as Lerner Project ("Lerner Project"), along with my wife Karen Lerner and our business partner Russell Bevan ("Bevan") in 2016. I have been the Managing Member of Lerner Project since its formation.

14. Lerner Project is a boutique winery located in Napa Valley. My wife and I purchased the Armstrong Ranch vineyard on Diamond Mountain in Calistoga,

California in 2017.  The vineyard produces world class wines.

15. Bevan is Lerner Project's winemaker.  Bevan has collected 23 100-point scores for his wines, and he was chosen as Wine Spectator's Wine Maker of the Year in 2015.

16. Since 2016, Lerner Project wines have consistently received scores of 96 to 99 points from multiple critics.

17. In a short period of time, the Lerner Project brand has grown from 1,000 cases of wine per year to 3,000 cases of wine per year.  Since Matt Simpson's ("Simpson") departure from Lerner Project (which is addressed in more detail below), Lerner Project's sales have risen from $600,000 per year to $2,500,000 per year.

18. Lerner Project wines range from $95 to $425 per bottle.  All of Lerner Project's single vineyard wines score 97 points or higher and sell for $275 per bottle.  Lerner Project's price point is the average for Napa Valley premium wines.

19. Based on the price point for Lerner Project wines, I believe the primary purchasers of Lerner Project wines are in the top 1-2% of the wealthiest individuals in the United States.

20. Lerner Project networks with over 30 other wineries that share the same type of customers who are referred within that network.  For example, Lerner Project customers also purchase wine from other exclusive wineries such as Harlan, Colgin, Screaming Eagle, and Bryant Family.

**DEVELOPMENT AND MAINTENANCE OF LERNER PROJECT'S CUSTOMER LISTS**

21. In 2018, Lerner Project subscribed to VineSpring for the use of its customer relationship management ("CRM") and customer database system.  All information regarding Lerner Project customers needed to be input in the VineSpring CRM system, including the customer's name, email address, and phone number.

22. Simpson was the point person with VineSpring and maintained the customer information. He also ran all of Lerner Project's point-of-sale orders through VineSpring until he was relieved of his duties on June 12, 2020.

23. During the first half of 2020, I put together lists of potential customers for Lerner Project wines from my extensive database and acquaintances from my 40+ years as a business owner to be input in the VineSpring CRM system.

24. I also received customer lists from numerous other sources, including Bevan, trade show events, road show events, auctions, wine tastings, country clubs, the Food and Marketing Institute, the Produce Association, the NWPCA and WPA pallet associations, the Lumberman's Association, Phi Delta Theta fraternity national members, and friends, as well as from Vine Vault as discussed below. The lists typically included a name and email address, and sometimes a phone number and address. These lists were also input in the VineSpring CRM system.

25. Additionally, Lerner Project receives a lot of clients from referrals from other wineries. Lerner Project networks with over 30 wineries where Lerner Project and the wineries share in sales and adding names to their customer lists.

26. Through these sources, over 5,000 customers were entered into Lerner Project's customer database in 2020.

## VINE VAULT

27. Defendant Vine Vault LLC ("Vine Vault") offers wine storage, wine transport, winery services, sommelier services, retail items, and wine events.

28. To the best of my knowledge, Defendant Elton Potts ("Potts") is the founder, majority owner, and Managing Member of Vine Vault and, to my knowledge, always has been. As such, Potts has always exercised complete control over the operations and management of Vine Vault.

29. My wife Karen Lerner and I are minority members in Vine Vault. When we first invested in Vine Vault in 2015, we owned a 5.52% membership interest. I have never been a "majority owner" of Vine Vault as alleged in the

- 4 -
DECLARATION OF STUART LERNER - 3:22-CV-07305-jd

1 Motion, and I can only presume that intentional misrepresentation was made to
2 Hundred Acre by Simpson who knew that it was false based on his extensive
3 involvement with Vine Vault as a Lerner Project consultant.

30. My wife and I have never been involved in the operations or management of Vine Vault in any way whatsoever nor have we ever had access to any of Vine Vault's books and records other than summary level financials we receive with our annual K1.

**VINE VAULT EVENTS**

31. As part of Vine Vault's business, Vine Vault holds "road show" and wine dinner events in cities to promote wines from various participating wineries. These events range from 60 to 300 people. Vine Vault sends participating wineries the guest lists, including email addresses, for the events ahead of time. The guest lists are derived from all of the participating wineries.

32. There are typically at least ten wineries participating at each Vine Vault road show event. The wineries that participate in the events sell wine for over $200 per bottle.

33. Lerner Project is not invited to all of the Vine Vault road show events, nor does it attend all of them.

34. Lerner Project networks with most of the wineries that attend the events, and the wineries constantly give referrals to each other.

35. Lerner Project attended and marketed its wines at a number of Vine Vault road show events in Florida, Georgia, and Texas starting in the first quarter of 2020. As a result, Lerner Project received guest lists from Vine Vault for the road show events Lerner Project attended.

36. Lerner Project also participated in Vine Vault wine dinners in Atlanta and Austin. Lerner Project received the guest lists for these dinners as well.

37. Lerner Project received at least one email from Vine Vault in 2018 and at least 10 emails from Vine Vault in the first quarter of 2020 attaching guest lists

- 5 -
DECLARATION OF STUART LERNER - 3:22-CV-07305-jd

for Vine Vault events.  It is important to note that these lists were also emailed to all of the other wineries that attended the events in 2020.  True and correct copies of the emails from Vine Vault attaching guest lists, sans the lists, are collectively attached as Exhibit A to the Compendium filed concurrently herewith.  The lists attached to the emails contain the names and contact information of 2,197 guests.

38. Upon receiving Vine Vault road show and wine dinner guest lists, some of the guests' contact information was entered into Lerner Project's customer database.

39. The guest lists from the Vine Vault road show and wine dinner events are the only Vine Vault customer-related data Lerner Project representatives and I have ever had access to or received from Vine Vault or Potts.  We have never had access to or received any other customer data from any of the other services Vine Vault provides.

40. I was not aware that there was a non-disclosure agreement between Vine Vault and Hundred Acre until I read that in the Complaint and motion papers filed by Hundred Acre in this action.

## CUSTOMERS OBTAINED FROM BEVAN

41. Given his celebrity in the wine industry, I requested Bevan attend the Vine Vault road show events with other Lerner Project representatives when he was available. In connection with that request, I asked Bevan to provide me with the names, email addresses, and phone numbers of his friends and clients in Florida, Georgia, and Texas so that Lerner Project could make sure they were invited to the events and so they would receive notifications of Lerner Project's wine releases.

42. Starting in November 2019 and in the months that followed, Bevan provided me the names and contact information of his friends and clients in Miami, Naples, Tampa, Jacksonville, West Palm Beach, and Atlanta.  Bevan never provided me a specific list, but when we talked and met together during that timeframe, Bevan would share his friends and clients' contact information with me and I would

write down the information and then add it to Lerner Project's master customer list.

## MATT SIMPSON'S INVOLVEMENT WITH LERNER PROJECT

43. Simpson was brought on as a sales consultant to Lerner Project in 2016 with a salary of $8,000 per month. His compensation increased to $12,000 per month in 2017. His duties included overseeing sales and marketing. Simpson also made a $10,000 investment for a minority membership interest in the company.

44. Simpson made a lot of promises to me that he had clients in Florida, Georgia, and Texas and that he would be able to greatly increase sales. As time went on, I could see that these were empty promises as his sales never reflected such connections.

45. Simpson claimed that he could generate over $2,500,000 in wine sales annually. However, in the three years that he was with Lerner Project, Simpson only generated a total of $250,000 in sales. This was highly problematic since Simpson's consulting fee was far in excess of the sales he generated.

## SIMPSON'S INVOLVEMENT WITH LERNER PROJECT'S CUSTOMER LISTS

46. In connection with his marketing and sales efforts, Simpson was involved in building and maintaining Lerner Project's customer lists.

47. For example, in February 2020, Simpson asked me to enter potential clients in our point-of-sale system, VineSpring, so they would receive invitations to Lerner Project's Vine Vault's road show events in Florida, Georgia, and Texas and our release letter to purchase Lerner Project's newly released 2018 wines.

48. Simpson knew that Lerner Project received guest lists from the Vine Vault road show events because he participated in all of the events and was included on the emails from Vine Vault to all the wineries attaching the guest lists. Simpson would input the names, addresses, email addresses, and phone numbers to Lerner Project's customer list. Simpson also sent emails from Lerner Project to the guests from the events. Additionally, Simpson called guests to try to sell them wine.

49. I never told Simpson that I had a Hundred Acre customer list, and I never instructed Simpson to input customers from any Hundred Acre customer list into Lerner Project's customer database, whether VineSpring or otherwise. Simpson's statements to that effect are false and appear to be part of a pattern of his to try and harm Lerner Project.

**SIMPSON'S SEPARATION FROM LERNER PROJECT**

50. I wanted to release Simpson from his duties in November 2019, but I was persuaded to give him another six months to see if he could make the necessary changes to prove his worth to the company. Simpson failed to do so.

51. Simpson was relieved of his duties as a consultant with Lerner Project on June 12, 2020 due solely to his poor performance with sales and marketing.

52. To be clear, Simpson was not terminated. Rather, he was told that his consulting services with Lerner Project were no longer needed.

53. When Simpson was relieved of his consulting duties, his company email and access to VineSpring were terminated on June 12, 2020.

54. Despite being relieved of his consulting duties, I advised Simpson he could maintain his 10% ownership position with Lerner Project. In response, Simpson advised me that he did not want to be part of the business if he was not allowed to work any longer. Negotiations over his complete separation from the company ensued.

55. Simpson did not take the separation well. On June 19, 2020, Simpson sent me a letter regarding our ongoing negotiations over the terms of his separation from Lerner Project. In the letter, Simpson made concerning comments about his mental state and threatening comments if I did not comply with his payment demands, including the following:

> I'm pretty sure that you are aware that 2020 has been a very challenging year for me physically and mentally. I finally made contact with the therapist who helped me when I first moved to CA. I hope she's a better healer now than she was 20 years ago.

> …
>
> I would like you to know that you have cost me the 2 most important things in my life. My passion for wine and the love of my wife. Both may have been irreparably damaged in the last week. She will not speak to me and every sip of wine tastes off. Everything in my life is quite dark right now.
>
> I had intended to ask for my 18L of Tench. But now when I see it there is nothing beautiful about it anymore. It just makes my heart hurt.
>
> …
>
> If you leave me a minority partner I know what will happen. I will become bitter and dark. I will become a constant thorn in your side. That's not what I want and I'm pretty sure you don't want that either.
>
> I do not want to be an impediment to your success.
>
> The wine community is quite small and I would really like to be able to tell people we parted on good terms.

A true and correct copy of Simpson's letter is attached as Exhibit B to the Compendium filed concurrently herewith. It should be noted that Simpson makes no mention in this letter of allegedly being terminated for not inputting Hundred Acre client lists into VineSpring.

56. Simpson and I finally agreed on a purchase price for his membership interest. In order to effectuate his separation and the sale of his membership interest, Simpson entered into a Release Agreement dated July 24, 2020, a Membership Purchase Agreement dated July 24, 20220, and an Assignment of Membership dated July 28, 2020, true and correct copies of which are attached as Exhibits C, D, and E, respectively, to the Compendium filed concurrently herewith

57. The Release Agreement contains the following non-disparagement provision:

> Section 2.02. <u>Non-Disparagement</u>. The parties, on behalf of themselves and their respective spouses, heirs, successors. and assigns, covenant and agree that they will not disparage any of the other parties to this Agreement, or their respective members, officers, directors, agents,

representatives or employees, either orally or in writing, in public or in private, in any manner whatsoever. If any party is asked about the other party to this Agreement, each shall respond that the parties had a dispute, and that the dispute was settled and the terms of the settlement is confidential. Nothing in this Section is intended, or shall operate to vitiate the protections of California Civil Code Section 47 in any way in the event that any party is required to provide information or give testimony in the context of a judicial or quasi-judicial proceeding which such party did not initiate, maintain, prosecute or voluntarily aid.

Compendium, Ex. C at p. 1, § 2.02.

58. The Membership Purchase Agreement contains the same non-disparagement provision as well as the following provision regarding the return of all customer information:

> Section 2.03. <u>Seller to Return All Customer Information to Purchaser</u>. No later than concurrently with the execution of this Agreement, **Seller agrees to return to Purchaser (i) any and all original or copies of customer lists of the Company; (ii) any customer information that Seller may have or use from Vine Spring, and/or (iii) any Confidential Information of the Company.** The term 'Confidential Information' means all information disclosed to the Purchase by the Company or its agents or employees in any manner, whether original or copy, whether orally, visually or in tangible form (including, without limitation, documents, devices and computer readable media), financial operations, strategic plans and market information of the Company. The term Confidential Information also includes business and management methods, know-how, trade secrets, instruction manuals, financial reports and statements, business, product and strategic plans, market information and analysis, financial and operational controls and procedures, **client identity and client information**, customer lists and all other information developed and used by the Company in its business and operations which has not been publicly disclosed by the Company.

Compendium, Ex. D at p. 2, §§ 2.03 and 2.04 (bold/underline added).

59. Lerner Project paid Simpson $60,000, six times the investment he made into the business for his 10% interest, and he made almost $450,000 in consulting fees in his three years with the company. Yet, for some inexplicable reason, Simpson was bitter that Lerner Project relieved him of his consulting duties.

- 10 -

DECLARATION OF STUART LERNER - 3:22-CV-07305-jd

## SIMPSON'S ATTEMPTED THEFT OF LERNER PROJECT WINES

60. In July 2020, just after his separation from Lerner Project, Simpson tried to steal Lerner Project large format wine bottles.

61. Simpson previously had the bottles shipped to an etching company, G3. However, G3 never etched the bottles because Simpson instructed them not to.

62. All of the large format bottles had wine in them but were blank bottles.

63. After being relieved of his duties, I am informed and believe based on information I received from G3 that G3 contacted Simpson about the wine, and that sometime in July, Simpson hired a friend of his, Dan Ritzenthaler ("Ritzenthaler"), to go to G3 and pick up the bottles and take them back to his house.

64. I am further informed and believe that Ritzenthaler picked the bottles up and put them in Simpson's garage, and that Simpson gave Ritzenthaler a 3 liter bottle for doing this for him.

65. When I called Simpson out on this, Simpson said that he had the wine in his garage. Simpson was ashamed that he got caught.

66. When I drove to Simpson's house, all of the large format bottles had been left by his front door. The total value of the wine was over $50,000. I was shocked that he would leave such valuable bottles out where anyone could have taken them.

67. When I told Simpson we were still missing a bottle, he said he would look for it. As it turned out, he had to go to Ritzenthaler and get the bottle back. Simpson eventually dropped off the bottle at my home in Walnut Creek.

68. The bottle was delivered in a different three liter corrugated box than what Lerner Project supplies. Simpson told me he could not find the box so he put the bottle in a different box.

## HATE MAIL LIKELY SENT BY SIMPSON TO LERNER PROJECT

69. In August of 2022, a vulgar, anonymous, handwritten note addressed to

Simpson's replacement, Brigid Babb, was delivered to Lerner Project's post office box in Napa. The note states the following:

> Cunt! Move on down the Road + fuck someone else's shit up. Can't understand how u r even employable.
>
> Fat cunt
>
> Chunk

A true and correct copy of the note is attached as Exhibit F to the Compendium filed concurrently herewith.

70. True and correct copies of samples of Simpson's handwriting during the time he was with Lerner Project are collectively attached as Exhibit G to the Compendium filed concurrently herewith.

71. Based on the timing of the delivery of the note and its content, along with the opinion of our handwriting expert that there is a strong probability Simpson authored the note, I believe that the note was sent by Simpson.

## SIMPSON'S THEFT OF LERNER PROJECT'S TRADE SECRETS

72. As set forth above, Simpson contractually obligated himself to not disparage Lerner Project and to return all of Lerner Project's customer information to the company after his separation.

73. I believe that Simpson first contacted Jayson Woodbridge ("Woodbridge") of Hundred Acre in or around the spring of 2022.

74. I believe Simpson improperly accessed and stole Lerner Company's confidential and protected customer data, as Simpson no longer had access to Lerner Project's point-of-sale system, VineSpring, following his separation. Specifically, I believe Simpson stole Lerner Project's customer information from VineSpring and gave it to Woodbridge based on their admissions in their declarations filed in support of the subject Motion.

75. Lerner Project considers its customer list and customer information to be trade secrets and treats them as such.

76. Lerner Project has since changed its point-of-sale system to Ecellars.

77. Simpson obviously has an ax to grind with me and Lerner Project. The information Simpson provided to Woodbridge and Hundred Acre is absolutely false, and Simpson knows it is false.

## HUNDRED ACRE

78. I have never seen or received any Hundred Acre customer list from Vine Vault or any other source.

79. Lerner Project and Hundred Acre presumably share some of the same customers as they both make world class wines. Lerner Project and Hundred Acre are in the same wine publications and use the same critics to rate their wines. All of Lerner Project's customers purchase wines from other quality wineries, and the exact same thing can be said about Hundred Acre.

80. Given that Lerner Project and Hundred Acre both produce high end wines and cater to the same type of customer, I believe it is likely that there are customers on Lerner Project's customer list that also appear on Hundred Acre's customer list.

## SERVICE OF COMPLAINT AND MOTION

81. Hundred Acre served Lerner Project and me with the Summons and Complaint by substitute service on December 16, 2022. Notwithstanding the fact that the Motion was filed four days earlier on December 12, 2022, Hundred Acre did not serve the Motion on us concurrently with the Complaint. Rather, Hundred Acre waited until December 21, 2022 to serve us with the Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 6th day of January 2023, in Walnut Creek, California.



Stuart Lerner